1 A.3d 703 (2010)
415 N.J. Super. 106
STATE of New Jersey, Plaintiff-Respondent,
v.
Paul A. FOGLIA, Defendant-Appellant.
Docket No. A-6332-07T4
Superior Court of New Jersey, Appellate Division.
Submitted May 4, 2010.
Decided July 16, 2010.
*706 Yvonne Smith Segars, Public Defender, attorney for appellant (Alison Perrone, Designated Counsel, on the brief).
David J. Weaver, Sussex County Prosecutor, attorney for respondent (Gregory R. Mueller, First Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges WEFING, MESSANO and LeWINN.
The opinion of the court was delivered by
MESSANO, J.A.D.
Defendant Paul A. Foglia was indicted by the Sussex County grand jury for the first-degree knowing and/or purposeful murder of Elizabeth J. Lott, N.J.S.A. 2C:11-3(a)(1) and/or (2); second-degree burglary, N.J.S.A. 2C:18-2; first-degree felony-murder of Lott, N.J.S.A. 2C:11-3(a)(3); and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). Following a jury trial, defendant was convicted of knowing and/or purposeful murder, the weapon offense, and the lesser-included charge of criminal trespass, N.J.S.A. 2C:18-3. After merging the weapon offense into the murder conviction, the judge sentenced defendant to life imprisonment with an 85% period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a concurrent eighteen-month sentence on the trespass conviction. On appeal, defendant raises the following issues:
POINT ONE
THE ADMISSION OF EXTENSIVE PRIOR BAD-ACTS EVIDENCE AND THE COURT'S FAILURE TO PROVIDE A LIMITING INSTRUCTION DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
POINT TWO
THE TRIAL JUDGE'S REFUSAL TO MORE SPECIFICALLY INSTRUCT THE JURY THAT A CONTINUING COURSE OF ILL TREATMENT COULD PROVIDE THE BASIS FOR A VERDICT OF PASSION/PROVOCATION MANSLAUGHTER VIOLATED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
POINT THREE
PROSECUTORIAL MISCONDUCT DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL. (Not Raised Below)
POINT FOUR
THE COURT ERRED IN EXCUSING JUROR NUMBER SEVEN AFTER TWO DAYS OF DELIBERATIONS IN ORDER TO ACCOMMODATE THE JUROR'S VACATION PLANS. (Not Raised Below)
POINT FIVE
THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING DEFENDANT TO A LIFE TERM BECAUSE A PROPER ANALYSIS OF THE AGGRAVATING FACTORS DOES NOT SUPPORT SUCH A SENTENCE.
In a pro se supplemental brief, defendant raises the following issues for our consideration:
POINT ONE
THE PASSION/PROVOCATION JURY CHARGE INCORPORATED *707 MISSTATEMENTS OF LAW AND OTHER ERRORS WHICH PRECLUDED THE JURY FROM PROPERLY CONSIDERING RELEVANT EVIDENCE LIKELY TO REDUCE THE OFFENSE OF MURDER TO MANSLAUGHTER. A LETTER SUBMITTED BY A DELIBERATING JUROR PRIOR TO SENTENCING ILLUSTRATES THE DEFECTS OF THE INSTRUCTION AND THE UNRELIABILITY OF THE VERDICT.
POINT TWO
THE BURGLARY AND FELONY MURDER COUNTS, PREDICATED ON THE DEFENDANT ENTERING THE RESIDENCE WITH INTENT TO COMMIT MURDER, AMOUNTED TO PREJUDICIAL DOUBLE CHARGING FOR MURDER, WHICH INFECTED BOTH THE PLEA OFFER AND THE TRIAL. THESE FLAWED COUNTS ESTABLISHED A DEFECTIVE PLEA OFFER BY THE STATE. AT TRIAL, THEY IMPERMISSIBLY SHIFTED THE ATTENTION OF THE JURY TO IRRELEVANT AND ERRONEOUS LEGAL CONCEPTS INSTEAD OF CONSIDERING THE MURDER OR PASSION/PROVOCATION ISSUE.
We have considered these arguments in light of the record and applicable legal standards. We reverse.

I.
At approximately 10:00 p.m. in the evening of September 24, 2004, Virginia "Gina" Liotta returned to the home she shared with her two young sons and her sixty-seven year old mother, Elizabeth J. Lott, in Wantage. Lott was a professor of economics at Pace University in New York and in very poor health. The house, described by the prosecutor as Lott's "dream home," was situated on forty acres and quite isolated from other homes in the area.
Along with her sons, Liotta had been out to dinner at her uncle's home in Totowa. Upon returning home, the sliding door to the family room was unlocked as it usually was. Liotta entered and found her mother "lying ... on the floor, face down[,]" surrounded by blood, with a wooden, folding tray table on top of her. Her thick eyeglasses were broken and lay on the floor near her body. Liotta called 9-1-1 and emergency medical personnel arrived at the home.
A neighbor, Jill Shrope, saw the emergency vehicles and went to Lott's house. She took Liotta's older son, who was six, back to her house, called defendant at the Fone Booth Bar and Restaurant (the Fone Booth) where he worked as a bartender, and told him to come to her house. Defendant arrived at Shrope's house approximately twenty minutes later.
Defendant and Liotta were involved in a tumultuous, twelve-year romantic relationship, and he was the father of her two sons. He had recently been hired by the Fone Booth, having worked in the past as an automobile mechanic, a male dancer, and a personal trainer. He was in excellent physical condition.
Lott did not care for defendant and limited his visits to her home to only two days per week so that defendant could see his sons. The acrimony between defendant and Lott, and the reasons for it, were the subject of much testimony at trial, and we examine that evidence in further detail below.
Investigators arrived at the crime scene, processed it, and secured various items for analysis. There were no signs of forced entry at the Lott home, nothing appeared to have been stolen, and there was no evidence of a sexual assault.
*708 Liotta and defendant went to the local police department with Detective Sergeant Donald Peter of the Sussex County Prosecutor's Office. Peter called the Fone Booth, and confirmed that defendant had worked there during the evening, but that he had left "for a period of time" claiming to be ill. Detective Virgil Rome, Jr., of the Prosecutor's Office went to the Fone Booth and secured the videotape from surveillance cameras at the bar parking lot. It revealed that defendant arrived for work at 6:01 p.m., left the premises at 7:51 p.m., and returned at 9:00 p.m., ample time for defendant to have gone to Lott's home, kill her, and return.
At trial, defendant's fellow employees and a patron at the bar testified that he did not appear to be ill on the evening of September 24, but claimed that he was. Defendant left the bar for some time. When he returned, he was disheveled, sweaty, and his eyes were bloodshot. Although he apologized for leaving in the middle of his shift, the manager fired him. Defendant remained in the bar, however, and ordered some food; he appeared nervous, was pacing, and repeatedly went to the men's room, leaving the bar after receiving a phone call.
Investigators questioned defendant after advising him of his Miranda[1] rights. Defendant denied killing Lott, though he admitted his relationship with her was not good. Defendant also initially denied leaving the bar at all, but subsequently told the police that he had left for twenty minutes to get some air. When confronted with his fellow employees' statements that he was gone for more than one hour, defendant admitted it might have been longer than twenty minutes but that "he absolutely never left the parking lot" of the Fone Booth. The investigators collected defendant's shoes and clothing, as well as DNA samples. Defendant's shoe tested positive for the presence of Lott's blood. Defendant was arrested on September 29 and charged with her murder.
At trial, the State introduced forensic evidence that the blood on defendant's shoe resulted from impact splatter and that defendant had been standing within ten feet of the blood source at the time. Lott was likely struck with the folding table when she was in a horizontal position. The medical examiner opined that Lott died from blunt impact trauma to her skull and brain, having sustained a skull fracture to her right side that was likely fatal and caused by significant force.
Alan Casey, a jailhouse informant, testified that defendant told him while both were incarcerated in the Sussex County jail that he went to Lott's house with the intention of killing her. Defendant professed his love for Liotta and the children, and that he wanted to live with them, but told Casey "the only way for it to happen was for [Lott] to not be there." Casey claimed defendant knew Lott would be alone in her home on the night of September 24 because he had earlier spoken to Liotta by phone. Indeed, in her testimony, Liotta corroborated a phone conversation with defendant had occurred earlier in the evening. Defendant told Casey that when he appeared at Lott's home the night of the murder, and she threatened to call the police, he "snapped," pushed her to the ground, and hit her with the folding table.
Defendant testified on his own behalf. It suffices to say that defendant admitted killing Lott, but claimed he did so in the heat of passion after she provoked him. As we note below, defendant's anticipated passion/provocation defense *709 became the central focus of the trial even before it was asserted through his testimony.
Defendant testified that he was sick on the night of the murder and left the Fone Booth, though he claimed it was with permission. He had spoken to Liotta by phone, and she was upset. Defendant believed it was due to the constant tension between her and her mother and he further thought they had argued that day. Defendant decided to go to Lott's home and speak to her about their problems.
Defendant saw Lott watching television through the rear sliding door. He "tapped" on the door and Lott let him in. However, the conversation deteriorated into a battery of insults; he called Lott "[a] witch." Defendant claimed Lott came at him swinging her arms and that she picked up the folding table and swung it at him, hitting him in the left arm, causing a minor laceration. He grabbed the table from her and hit her on the head. When she fell to the ground, he hit her again and left the table on top of her. Defendant claimed that after Lott hit him with the table, "[he] went into a blackout, a blur." He was enraged because Lott told him he was "not good enough for her daughter... [his] kids, [his] sons, [and] that if it was up to her she'd take [his] kids away... and ... [he] would never see [them] again."
During cross-examination, defendant acknowledged that he had given a number of different accounts of his activities on the night of the homicide to law enforcement authorities. He also admitted that in an attempt to have his bail lowered, he had supplied a false certification in which he claimed the police had coerced him into providing a formal statement immediately after arrest.[2] Defendant never indicated in any of those prior statements, however, that Lott had threatened or hit him with the folding table.
There was other evidence that inferentially challenged the credibility of defendant's version of the events in Lott's home. For example, when he was initially interviewed by the police, they observed no injury to his arm. Defendant also claimed that when he returned to the Fone Booth after the homicide, his frequent trips to the men's room were caused by nausea and his need to take care of the cut, but surveillance videotape did not appear to show any injury.
Based upon this evidence, and the additional evidence we detail below, defendant was convicted of the knowing and purposeful murder of Lott, possession of a weapon, the table, with an intent to use it unlawfully against Lott, and criminal trespass.

II.
Defendant argues that "extensive testimony regarding [his] prior bad acts" was admitted in violation of N.J.R.E. 404(b), that even if the evidence was admissible, its probative value was outweighed by it potential prejudice, see N.J.R.E. 403, and that the judge failed to provide any instructions to the jury on the proper use of such testimony. Defendant identifies this evidence as follows: "the fact that defendant had neglected his son, had been unfaithful to his girlfriend, had been employed *710 as a male stripper, had amassed substantial credit card debt, and had forged his son's name on a credit card application." The evidence at issue was introduced largely through Liotta's testimony and the cross-examination of defendant.
On direct examination, Liotta described how she met defendant in 1992 when she was a social worker and he was a "male dancer." The relationship was "on again, off again," and, although Liotta loved defendant, "[they] had a lot of problems." Early in the relationship, she discovered defendant had another girlfriend. Defendant "would call [her] obsessively" at work, and call her "bosses" to make sure she was working.
Defendant objected to the evidence at sidebar, specifically citing Liotta's testimony that defendant was "a male dancer," and claimed it was irrelevant. The judge overruled the objection, finding the testimony to be "proper introductory testimony to establish the nature of the relationship." The judge also ruled that the testimony about defendant "calling and checking" on Liotta was relevant because "it [went] to the issue [defendant was] raising," presumably the passion/provocation defense.
Liotta testified that although defendant continued to try to find other employment, he spent several hours each day lifting weights, "do[ing] aerobics," and going to the gym. After the couple's first child was born in 1998, Liotta went to law school and graduated in 2003. The couple continued their relationship, though they never lived together, and Liotta became pregnant again in 2003. Lott was upset that Liotta "was having another child with [defendant]." A second son was born, and while Liotta believed that defendant "loved his children," she testified that "[h]e did not" support them financially.
Liotta began to testify about the first time Lott met defendant. The couple had just started dating and defendant arrived for Thanksgiving dinner. When asked about defendant's dress and attitude at the dinner, defense counsel again objected.
[Defense counsel]: The objection is the one that I made ... before. It's a continued objection.
The reason that your Honor overruled my objection was you said that it went to our defenses.... [H]ow he lived[ ] does not go to our defense.
. . . .
[Judge]: This is the entire relationship that existed among these people since they met each other....
[Defense counsel]: ... It's not what took place between the witness and [defendant]. It's how Mrs. Lott reacted to what took place. Whether she was justified or not is not relevant. The passion and provocation goes to the action, not the reason for the action.... It's the expression of ... [Lott's] dislike that's relevant. It's not the reason for it.
The prosecutor argued the evidence went "to the motive of ... defendant," and demonstrated why Lott "hated [defendant] from the beginning," something defense counsel asserted in his opening statement. The judge overruled the objection.
Liotta continued to testify that at the dinner, defendant "spit" out the food her mother had cooked because it was prepared with salt. Her mother "was highly insulted." Liotta went on to describe her mother's disapproval of defendant's "dancing," and her concern that defendant was "doing other things, sleeping with people for money, prostituting himself.... [S]he was concerned that he could be in homosexual relationships."
Liotta described an incident during her second pregnancy when she was hospitalized *711 and became ill in her room. Defendant was the only person with her, but left without summoning a nurse. Liotta "call[ed] for help until three ... or four in the morning ... [and] just laid there throwing up."
Liotta described another incident that also occurred while she was in the hospital. Defendant was supposed to pick up their older son at school. When Liotta called him, defendant told her his car had broken down far from the school. Liotta became "hysterical," and began calling other parents; she finally reached one, and when she explained the problem, the parent told her that defendant was there with her, "eating a can of tuna fish." Liotta told her mother about the incident, and Lott responded, "this is the kind of thing [defendant] does...."
Early in the relationship, Lott told her daughter that defendant was "trying to control [her]" and was "stalking [her]." In the summer of 2004, there was a verbal altercation between defendant and Lott. She called defendant a "bum," and he called her "a fat pig," in front of the couple's son.
In addition to Liotta's testimony, defendant identifies several exchanges between him and the prosecutor on cross-examination that produced evidence in violation of N.J.R.E. 404(b). For example, during direct examination, defendant claimed that Lott did not like him because he "wasn't professional." On cross-examination, the prosecutor extensively questioned defendant about his debts, the fact that he had "lost five jobs in five years as a mechanic," and that he had "never saved anything...." The prosecutor then asked:
Q. Do you remember applying for a credit card in your son's name?
A. For Alexit was just for a joke.
Q. It was a joke?
A. I never used it....
Q. It was a joke. It was a joke. You do something that affects your son's credit
A. I never used [it].
Q. and you laugh about it?
A. I didn't. I didn't know any better at the time. I put his name on it. I got
Q. Forged a credit card application. Forged your son's name.
The prosecutor then questioned defendant extensively about his failure to pay child support, something he had asked Liotta about at length during her testimony.
The prosecutor also questioned defendant about an incident involving "a naked woman" being found under his son's crib shortly before his baptism; about defendant not telling Liotta that he had been married before; and extensively about an argument he had with another man who was friendly with Liotta during "the early part of [their] relationship...." The prosecutor asked if defendant "assaulted" the other man, which defendant denied, and whether he hid "in the bushes" before confronting the man.
The prosecutor asked defendant about his "dancing":
Q. Let's talk about that. You say dancing. We're not talking about the polka or the tango or anything?
A. No. I worked in Chippendale's in New York.
Q. Right. You danced at Feathers, right, gay club?
A. One time. I didn't like it and I quit.
. . . .
Q. You used to strip for money?
A. No, I worked out in a sola flex machine, but that was in like 1994.

*712 Q. No. You danced, you took off your clothes for money. That's what you did for a living?
A. Oh, yeah.
Asked if Lott "knew about [his] dancing," defendant replied that she did. The prosecutor then asked:
Q. She knew that you stripped at gay clubs?
A. No. And that was only twice. And I quit.
Q. You know that she suspected that you were involved in more conduct than just taking off your clothes, right?
A. I had no idea.
Q. You didn't know[?]
A. I said I [had] no idea.
Q. She never called you [a] male whore before?
A. No, she did not.
Over defense counsel's objection, the judge permitted the prosecutor to inquire about defendant's relationship with Brian Schell. Defendant claimed he was Schell's "personal trainer," and that Schell "offered [him] money to do body worshipping." During a break, the jury sent out a note asking what "body worshiping" was, and the prosecutor, over defendant's objection and contrary to the judge's earlier ruling limiting the testimony, was permitted to continue his questioning of defendant.
[Prosecutor:] [W]hen I was cross-examining you before, you had a sexual relationship with Brian Schell, right? There was a sexual component to it?
[Defendant:] For him it was sexual, not me.
[Prosecutor:] What does that mean, for him it was sexual? What are you talking about?
. . . .
[Defendant:] He got a sexual thrill out of... watching me work out or touching my body.
. . . .
[Prosecutor:] ... That's what I'm trying to get at. There was sexual contact between you and Brian Schell and there was money exchanged. Right?
Defendant: At the time there was, yes.
The State contends all of this evidence was "relevant to rebut an unfair and inaccurate attack against the victim, and to provide a proper framework for the jury to fully evaluate the events leading up to the murder." It further argues the evidence was "relevant to the issue of passion/provocation raised by the [d]efendant." According to the State, the evidence did not fall within the ambit of Rule 404(b)'s exclusion "of other crimes, wrongs, or acts," because the testimony only showed that defendant's behavior was "boorish, indolent and self-indulgent," and not that he had a propensity to commit murder.
We believe the State's arguments misconstrue our jurisprudence in this area. The evidence needed to be evaluated pursuant to Rule 404(b) and most of it should have been excluded because it was irrelevant. The only close question in our mind is if reversal is required because the testimony "raise[s] a reasonable doubt as to whether the [evidence] led the jury to a verdict it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973) (citing State v. Macon, 57 N.J. 325, 335-36, 273 A.2d 1 (1971)).
N.J.R.E. 404(b) provides:
[E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. [However,] [s]uch evidence may be admitted for other purposes, such as *713 proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
[Ibid.]
In State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992), the Court adopted a four-part test to determine the admissibility of such evidence.
The Cofield test requires that:
1. The evidence of the other crime must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.
[State v. Williams, 190 N.J. 114, 122, 919 A.2d 90 (2007) (citations omitted).]
Additionally,
even if relevant under N.J.R.E. 404(b), such evidence must nevertheless survive the crucible for all relevant evidence: "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."
[State v. Lykes, 192 N.J. 519, 534-35, 933 A.2d 1274 (2007) (quoting N.J.R.E. 403).]
We accord "great deference to the decision of the trial [judge]" regarding the admissibility of N.J.R.E. 404(b) evidence. State v. Barden, 195 N.J. 375, 390, 949 A.2d 820 (2008) (citing Lykes, supra, 192 N.J. at 534, 933 A.2d 1274). "However, when a trial court does not analyze the admissibility of other-crimes evidence under Cofield, we may conduct a plenary review to determine its admissibility." Barden, supra, 195 N.J. at 391, 949 A.2d 820 (citing Lykes, supra, 192 N.J. at 534, 933 A.2d 1274.)
In order to minimize the "inherent prejudice in the admission of other-crimes evidence," the judge must "sanitize the evidence when appropriate" before it is presented to the jury. Barden, supra, 195 N.J. at 390, 949 A.2d 820. After the admission of such evidence, the judge should clearly instruct the jury on the prohibited and permitted uses for which it may consider the evidence, and repeat the instructions at the conclusion of the case. State v. Blakney, 189 N.J. 88, 93, 912 A.2d 140 (2006).
We reject the argument that the testimony was not subject to analysis under Rule 404(b) because it did not involve a "crime[ ], wrong[ ] or act[ ]" committed by defendant. The analytic paradigm we detailed above has been applied in numerous instances where the other bad conduct evidence did not amount to a crime, or, to use the language of the Rule's predecessor, a "civil wrong."[3]See State v. Covell, 157 N.J. 554, 564-71, 725 A.2d 675 (1999) (applying the analysis to defendant's statement that he liked "`young girls'" in a prosecution for luring); State v. Nance, 148 N.J. 376, 388-89, 689 A.2d 1351 (1997) (applying the analysis to a series of *714 non-criminal "bad conduct" events between defendant and his girlfriend); State v. Koskovich, 168 N.J. 448, 483, 776 A.2d 144 (2001) (subjecting the defendant's writings, "[a]lthough not overtly criminal in nature," to the "Cofield analysis"). Moreover, some of the alleged conduct disclosed through the testimony was indeed criminal or quasi-criminal in nature, e.g., that defendant forged an application for a credit card and was a male prostitute.
We also reject the State's assertion that the Rule "only prohibits reference to an act that demonstrates a propensity for a similar action," and that the jury could not have considered this evidence as demonstrating defendant's propensity to commit murder. The Rule cannot be read in such a crabbed fashion. The evil the Rule seeks to avoid is that "[i]f other crime evidence were to be admitted, the jury might think of a defendant as a bad person in general and convict...." Biunno, Current N.J. Rules of Evidence, comment 7 on N.J.R.E. 404 (2010) (citations omitted); see also Model Jury Charges (Criminal), "Proof of Uncharged Crimes, Wrongs, or Acts," (June 2007) (advising jury "not [to] use th[e] evidence to decide that the defendant has a tendency to commit crimes or that (he/she) is a bad person") (emphasis added).
To be sure, some of the evidence, particularly the early part of Liotta's testimony describing the acrimony that existed between her mother and defendant throughout their relationship, was admissible outside the context of Rule 404(b). Our courts have distinguished this type of evidence, generally under the rubric of res gestae, because such evidence of "[t]he defendant's actions `serves to paint a complete picture of the relevant criminal transaction' and therefore [is] admissible." State v. Long, 173 N.J. 138, 156, 801 A.2d 221 (2002) (quoting State v. Martini, 131 N.J. 176, 242, 619 A.2d 1208 (1993), cert. denied, 516 U.S. 875, 116 S.Ct. 203, 133 L.Ed.2d 137 (1995)). The judge correctly recognized this when he overruled defendant's initial objection, characterizing what had transpired to that point as "proper introductory testimony to establish the nature of the relationship." But that cannot be fairly applied to almost all that followed. Indeed, when the balance of the testimony is reviewed under the Cofield test, which we do de novo since the trial judge never considered the question, we conclude that the evidence cannot meet the first prong of the analysis, i.e., that it be "relevant to a material issue...." See Williams, supra, 190 N.J. at 122, 919 A.2d 90 (citations omitted).
The Court has recently considered the issue of relevancy as it relates to 404(b) evidence.
[T]o be relevant, the other-crimes evidence must bear on a subject that is at issue at the trial, for example, an element of the offense or some other factor such as motive, opportunity, intent, or plan. In determining whether 404(b) evidence bears on a material issue, the Court should consider whether the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede. Further, the other-crimes evidence must be necessary for the proof of the disputed element. Indeed, in assessing the fourth prong, courts should consider whether the matter can be proved adequately by other evidence.
[State v. P.S., 202 N.J. 232, 256-57, 997 A.2d 163 (2010) (citations omitted).]
The State attempted throughout the trial to argue that the evidence was relevant for a variety of reasons. First, that it showed motive, i.e., that defendant *715 knew Lott hated him, that he believed she was "poisoning" Liotta against him, and he wanted the victim out of the picture. We agree that Lott's hatred of defendant and her influence over her daughter were highly relevant and provided a motive for why defendant killed her, and by implication, a negation of his claim that Lott provoked him when he attempted to mitigate the tension between them.
But we fail to see how specific instances of defendant's conduct towards Liotta while she was in the hospital, or his financial circumstances, or his job as a male dancer, or insinuations of prostitution and credit card fraud, were relevant to his motive for killing Lott. Certainly, the State introduced the general theme of the bitter animosity between defendant and Lott through the testimony of Liotta and her brother Joseph, and, to the extent it did so without references to specific conduct by defendant, the evidence was proper. Defendant essentially admitted in his statements to the police, and certainly in his testimony, that Lott hated him and attempted to influence her daughter to sever her relationship with him. Lott may have been well-justified in her evaluation of defendant's character and in trying to break his hold over her daughter; but whether Lott's dislike of defendant was deserved or not was irrelevant to defendant's motive.[4]
The State also advanced an argument repeatedly at trial, as it does before us in a single sentence, without any citation, that the evidence "was relevant to the issue of passion/provocation raised by the defense." We disagree.
As the Supreme Court has instructed,
Murder is reduced to manslaughter if the murder is committed in the heat of passion in response to a reasonable provocation. N.J.S.A. 2C:11-4 b(2). Passion/provocation manslaughter has four elements: (1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying. The first two elements of the offense are objective; thus, if they are supported by the evidence, the trial court should instruct the jury on passion/provocation manslaughter, leaving the determination of the remaining elements to the jury.
[State v. Josephs, 174 N.J. 44, 103, 803 A.2d 1074 (2002) (citations omitted).]
To be sure, "the State must prove beyond a reasonable doubt that defendant had not killed his victim in the heat of *716 passion caused by a reasonable provocation[,]" in order to secure a murder conviction. State v. Viera, 346 N.J.Super. 198, 212, 787 A.2d 256 (App.Div.2001) (citations omitted), certif. denied, 174 N.J. 38, 803 A.2d 634 (2002).
However, the State has not demonstrated how Lott's animosity toward defendant, well-justified or not, is relevant to prove an essential element of murder, or disprove an element of defendant's asserted claim. During the trial, in response to defendant's objection, the prosecutor claimed the evidence showed "[t]here were plenty of reasons that [Lott] didn't like ... defendant." Because she "had valid reasons to treat... defendant the way she did," the prosecutor argued Lott's provocative conduct, if it took place as defendant claimed, was not "unreasonable."
This argument, however, entirely misstates the relevant inquiry. Regarding the adequacy of the provocation, "[t]he question ... essentially amounts to whether loss of self-control is a reasonable reaction." State v. Mauricio, 117 N.J. 402, 412, 568 A.2d 879 (1990). Lott's reason for treating defendant as she did, or as he claimed she did, was irrelevant because the "test is purely objective, [and] the provocation must be `sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control.'" Ibid. (quoting State v. King, 37 N.J. 285, 301-02, 181 A.2d 158 (1962) (in turn quoting State v. Herrmann, 77 N.J.L. 534, 535, 76 A. 1086 (E. & A.1909))). In other words, the fact that defendant engaged in the "boorish, indolent and self-indulgent" instances of specific conduct the State adduced, and further assuming Lott knew about them, we fail to see how that knowledge is relevant to any materially, disputed fact regarding defendant's asserted passion/provocation manslaughter defense.
In reality, the State's justification for introducing this extensive testimony, as acknowledged in its brief, was to "rebut an inaccurate and unfair attack on the victim." We assume this means that defendant's testimony regarding the events that occurred over twelve years, and his conclusion that Lott's hatred of him was misplaced, was fair game and could be attacked through specific instances of his bad conduct to show that Lott's hatred was justified. There is no basis for this in our evidence rules. See N.J.R.E. 608(a) (excluding "specific instances of conduct" as proof of a character trait affecting credibility); see also State v. Darby, 174 N.J. 509, 520, 809 A.2d 138 (2002) (generally noting that other-crime evidence is not admissible solely to affect credibility).
We conclude that virtually all of the evidence adduced by the State was inadmissible and should have been excluded. Although defendant objected in some instances, he did not in many others. For example, much of the cross-examination of defendant was uninterrupted by objection. Whether reviewed as plain error or not, see R. 2:10-2, the question is whether the evidence as a whole "raise[s] a reasonable doubt as to whether ... [it] led the jury to a result it otherwise might not have reached." Bankston, supra, 63 N.J. at 273, 307 A.2d 65 (citation omitted).
The State's proofs were substantial. It produced circumstantial evidence that defendant's claim of going to Lott's house to ease the tension between them was incredible, that he told Casey his intention was otherwise, that he repeatedly lied about his whereabouts that night to the police, that his physical superiority over Lott made any attack by her unlikely, and that he had the motive to kill her. The only material issue in dispute was defendant's state of mind, and in this regard, defendant's evidence was limited to his testimony, *717 and, in an ironic way, the same evidence of hatred and distrust that the State used to prove motive. Because there were no eyewitnesses to the murder except defendant, the jury's assessment of his credibility was critical.
The Court has recognized that "`[t]he likelihood of prejudice is acute when the proffered evidence is proof of a defendant's uncharged misconduct.'" Barden, supra, 195 N.J. at 394, 949 A.2d 820 (quoting State v. Stevens, 115 N.J. 289, 302, 558 A.2d 833 (1989)). Moreover, while we deem the evidence to be irrelevant, and inadmissible in the first instance, the jury was never provided with any instruction regarding the permissible and impermissible uses of such other bad acts testimony. Thus, without any guidance, the jury was free to utilize the testimony for an impermissible purpose, i.e., that the defendant was a bad person. Viewed in tandem, we maintain a reasonable doubt that the repeated admission of irrelevant other bad acts evidence may have led the jury to a result that it otherwise may not have reached, and we therefore reverse defendant's conviction.

III.
As a result of our conclusion, we need not address the issues defendant raises in Points Four and Five. We find the issue defendant has raised in Point Two of his pro se supplemental brief to be of insufficient merit to warrant any further discussion. See R. 2:11-3(e)(2). We address the remaining points only for guidance in the event of a retrial.
In Point Two and in Point One of his supplemental pro se brief, defendant contends the judge failed to properly instruct the jury as to passion/provocation manslaughter. He admits that the judge utilized the model charge, and, as per his request, specifically referenced the "twelve-year history between [him] and Lott." However, he claims the charge "did not sufficiently explain how the cumulative impact of a series of events ... could be relevant to the issue of provocation," and emphasized "the necessity of there being `a significant physical confrontation' immediately preceding the killing."
We believe the judge properly utilized the model jury charge as it then existed. He explained the relevance of the extended acrimony between defendant and Lott, thus tailoring the jury instruction to the facts presented. See State v. Robinson, 165 N.J. 32, 42-43, 754 A.2d 1153 (2000). The judge properly told the jurors that there needed to be more than words alone to substantiate a reasonable provocation. See Viera, supra, 346 N.J.Super. at 215, 787 A.2d 256 ("[O]rdinarily words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter.") (citation omitted).
To the extent defendant claims that the judge erred by telling the jury there needed to be "a significant physical confrontation" between defendant and Lott, we note the model charge uses that phrase. Moreover, the phrase connotes the fact that defendant's response must be to a reasonable provocation. See State v. Docaj, 407 N.J.Super. 352, 368-69, 971 A.2d 418 (App. Div.) ("Although perhaps sufficient to warrant the instruction, the evidence of an alleged slap was conceded to be insufficient to constitute adequate provocation.") (footnote omitted), certif. denied, 200 N.J. 370, 982 A.2d 457 (2009); see also State v. Oglesby, 122 N.J. 522, 536, 585 A.2d 916 (1991) (finding insufficient provocation to warrant an instruction on passion/provocation manslaughter when unarmed victim slapped the defendant).
*718 As defendant notes in his pro se brief, however, the model charge used by the trial judge contained an error that we recognized in Docaj, supra, 407 N.J.Super. at 370-71, 971 A.2d 418. On retrial, the charge must comply with our holding.
The State argues that there was no need to provide the passion/provocation charge because the evidence was insufficient to support the claim. We do not address the issue because we do not know what proofs may be adduced during any retrial.
We also note that defendant, in Point Three, alleges that prosecutorial misconduct in summation requires reversal. We would not reach the same conclusion. However, the prosecutor's frequent comments that defendant was "a liar" should not be repeated.
Reversed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The State withdrew its proffer of the formal post-arrest statement during pre-trial hearings on defendant's suppression motion. Defendant attempted to introduce the statement before testifying, the State objected, and the judge ruled it was inadmissible. However, during cross-examination, defendant was asked to review various portions of the statement, and did so again on re-direct. Ultimately, the judge granted the State's motion to admit the statement into evidence over defendant's objection. There is no issue raised on appeal regarding defendant's formal post-arrest statement.
[3] See Evid. R. 55 ("[E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, ... such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.").
[4] We also note that during trial, the State argued on occasion that defendant had other motives for killing Lott. For example, in arguing that defendant's "body worshipping" activity with Schell was admissible, the State claimed that defendant killed Lott because she called him "a male whore." This epithet, the State argued, was particularly "sting[ing]" because defendant had, in fact, engaged in prostitution. In his summation, in listing all of defendant's motives, the prosecutor claimed defendant killed Lott "to keep his secret" regarding Schell. But, there was no evidence that Lott called defendant "a male whore" to his face, and defendant denied that she ever did. There was no evidence that Lott knew defendant had engaged in "sexual contact" with Schell. The State also advanced an argument in front of the jury, through the questioning of defendant, and again in summation, that Lott was killed so that defendant would have access to her estate, even though he was not married to Liotta. In summation, the prosecutor claimed that defendant "needed some money" and "the reasonable security that ... Lott could give him." We believe the State's theory that Lott was killed for her money was speculative based on the evidence adduced before the jury, but, more importantly, much of the testimony that was admitted was not probative of such motive.