**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0249-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BYAD LOCKETT,

    Defendant-Appellant.

_____

Submitted December 3, 2025 – Decided March 16, 2026

Before Judges Gummer, Vanek, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 21-12-2523.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Theodore N. Stephens II, Essex County Prosecutor, attorney for respondent (Shep A. Gerszberg, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Byad Lockett appeals from his convictions and sentence for attempted murder, aggravated assault, and weapons possession. We affirm.

I.

In September 2021, defendant was detained at the Essex County Jail pending charges unrelated to this appeal. The jail houses inmates in units known as "pods." Each pod has two levels, with sixteen cells per level and two inmates assigned to each cell. A single corrections officer is stationed inside each pod and is responsible for supervising the sixty-four inmates housed there. Each pod is monitored by two video cameras.

On the morning of September 23, another inmate, Jayshawn Boyd, was moved to the second level of pod 3-C, where defendant was also housed. That day was designated for general cleaning of the facility and commissary distribution. Some of the inmates, including defendant, were assigned to help distribute commissary bags. Corrections Officer Jeremy Alvarado opened Boyd's cell so his cellmate could claim his commissary order. Against Alvarado's instruction, Boyd exited his cell, descended to the first level and said, "I want to fight. Where they at?" In an effort to restore calm, Alvarado told Boyd to speak privately with him, but Boyd refused. Inmate Davon Branch also attempted to de-escalate the situation by encouraging Boyd to speak with

A-0249-23

Alvarado. Boyd ignored the request, screamed profanities, and ran about, cursing and spitting on other inmates, as Branch later testified.

Alvarado ordered the civilian commissary worker to leave the unit and cancelled the delivery. Boyd continued to pace back and forth on the first floor. Meanwhile, defendant and other inmates, assisting staff with commissary duties, were out of their cells. All inmates refused Alvarado's orders to return to their cells. With that, Alvarado alerted other officers a fight was imminent.

Boyd began a fist fight with Isaad Jackson and Darryl Watson. Multiple inmates, including defendant, joined the fray. Alvarado repeatedly ordered the inmates to return to their cells and "lock in." They did not comply. Following officer safety protocols, Alvarado exited the pod and observed the fight from behind a protective window. He witnessed seven inmates, including defendant, punch, kick, and attack Boyd with various items, including a microwave oven, a water cooler, and broomsticks. With assistance of two other officers, Alvarado entered the pod to restore order. Alvarado identified defendant and his co-defendants as the assailants.

A physician, Dr. Rommel Montilus, also responded and found Boyd motionless on the floor. He observed Boyd bleeding from the head with labored

A-0249-23

breathing. The doctor administered oxygen with an Ambu-bag,[1] and Boyd was transferred to University Hospital in Newark, where Dr. Fariha Sheikh treated him. Dr. Sheikh diagnosed Boyd with trauma, epidural hematoma, facial fractures, acute respiratory failure and hypoxia, traumatic brain injury, skull fractures, orbital floor fractures, and jaw fractures. He remained hospitalized for eighty-two days, surviving his injuries.

In December 2021, an Essex County grand jury returned an indictment charging defendant and six other inmates with twenty-one counts, including conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1) and 2C:11-3(a)(1); first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); third-degree riot, N.J.S.A. 2C:33-1(a)(3); and third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2.

The court presided over the jury trial of defendant, Jackson, and Watson from May through June 2023, while severing the trials of the remaining four

---

[1] An "Ambu-bag" is the propriety name for a hand-held device, similar to a balloon, used to provide positive pressure ventilation to a patient who is not breathing or is breathing inadequately.

defendants. At trial, the State called multiple witnesses, including Dr. Montilus, Dr. Sheikh, and Officer Alvarado. Defendants called David Branch.

As Dr. Montilus took the stand, the prosecutor elicited his credentials and tendered him as an expert in general medicine. Defendants objected, arguing the State had hampered their ability to prepare for cross-examination by failing to disclose the doctor's medical findings and opinions. The trial court permitted the doctor to testify as an expert in general medicine but restricted the scope of his testimony to the contents of a one-page report he had prepared at the time of the incident. The court also permitted the doctor to provide "a medical opinion" based on his report.

On direct examination, the prosecutor asked Dr. Montilus whether Boyd would have died but for the resuscitation efforts. Co-defendants' counsel objected, arguing the question called for speculation and constituted an expert opinion the defense had not received prior notice of. Defendant's counsel joined the objection. The court overruled the objection, stating,

> Well then let him answer that. Maybe he can answer, maybe he can't. I mean, I think it's -- again, he's an expert in general medicine, he was treating him. I think he's qualified to perhaps make that assessment. He was there to assess and evaluate the condition that Mr. Boyd was in at the time. It's fair.

Defense counsel moved for a mistrial based on Dr. Montilus's purportedly

A-0249-23

unexpected opinion, renewing prior objections and arguing he had addressed an issue reserved exclusively for the jury on the attempted murder charge—namely, that but for medical treatment, Boyd would have died.  At a June 1, 2023 hearing, the court denied the motion.  It reasoned Dr. Montilus had not testified about the cause of the injuries, the identity of the participants, or their intent.  Instead, he "testified merely as to the life-saving measures he and his staff performed on Mr. Boyd."  The court further observed any layperson viewing the incident video could draw the same conclusion and the testimony was not unduly prejudicial.

When trial resumed, inmate Branch testified, claiming Boyd provoked the melee.  The State subsequently introduced a video that appeared to show that Boyd did not spit on any specific individual, contradicting Branch's account of the events.

At the jury charge conference, defense counsel asked the court to instruct the jury on the lesser-included offense of attempted passion/provocation manslaughter, arguing Boyd's fighting words, his spitting at other inmates, and his refusing to return to his cell constituted adequate provocation.  The court conducted a Canfield[2] analysis and concluded a reasonable person would not have reacted in a similar manner to the alleged provocation.  Accordingly, the

_____

[2]  State v. Canfield, 470 N.J. Super. 234 (App. Div. 2022).

A-0249-23

court declined to instruct the jury on the lesser-included offense.

On June 14, 2023, the jury convicted defendant of first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); three counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); three counts of third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and acquitted him on all other counts.

Defendant was sentenced in September 2023. The court found aggravating factors two (the gravity and the seriousness of the harm), three (risk of reoffending), six (prior criminal record), and nine (need for deterrence) applicable. See N.J.S.A. 2C:44-1(a)(2), (a)(3), (a)(6), (a)(9). It found mitigating factor fourteen (defendant was younger than twenty-six at the time of the offense), N.J.S.A. 2C:44-1(b)(14), but declined to find any other mitigating factors. The court merged the aggravated assault and possession counts with the attempted murder count and sentenced defendant to a term of twenty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, to run consecutively to his twelve-year sentence stemming from a January 2019 homicide.

A-0249-23

On appeal, defendant raises the following arguments:

POINT ONE

THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING DR. MONTILUS TO OFFER AN EXPERT OPINION WHICH NEITHER WAS DISCLOSED IN THE DOCTOR'S INCIDENT REPORT, NOR HELPFUL TO THE TRIER OF FACT.

POINT TWO

THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY AS TO THE LESSER OFFENSE OF [ATTEMPTED] PASSION/PROVOCATION MANSLAUGHTER.

POINT THREE

DEFENDANT'S SENTENCE OF TWENTY YEARS SUBJECT TO THE NO EARLY RELEASE ACT IS MANIFESTLY EXCESSIVE.

Expert Witness

"We give substantial deference to the trial court's decision as to whether a witness is qualified to present expert testimony." State v. Rosales, 202 N.J. 549, 562 (2010) (citing State v. Jenewicz, 193 N.J. 440, 455 (2008)). "Thus, the 'court's witness-qualification decision is subject to essentially an abuse-of-discretion standard of review and will only be reversed for manifest error and injustice.'" Id. at 562-63 (quoting Jenewicz, 193 N.J. at 455). Similarly, a decision to grant or deny a motion for mistrial is "entrusted to the sound

8

discretion of the trial court" and will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

Defendant renews his trial argument that Dr. Montilus's medical opinion was undisclosed and improperly addressed an element of attempted murder, a question reserved for the jury. He contends a video of the melee was sufficient for the jury to draw its own conclusions, rendering Dr. Montilus's opinion unnecessary and unduly prejudicial, and, therefore, its admission was reversible error. The State responds the doctor's testimony constituted a reasonable inference drawn from statements in the report and the trial court properly exercised its discretion in admitting it. The State's position is persuasive.

N.J.R.E. 702 governs the admission of expert testimony. It provides: "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Our Supreme Court has explained:

> The Rule has three [basic] requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the

witness must have sufficient expertise to offer the intended testimony.

[Jenewicz, 193 N.J. at 454.]

These requirements "are construed liberally" in favor of admissibility. Ibid.

Rule 3:13-3(b)(1)(I) governs the scope of discovery concerning experts to include:

> [the] names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Accordingly, "[w]hen an expert's report is furnished, 'the expert's testimony at trial may be confined to the matters of opinion reflected in the report.'" McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div. 1987) (quoting Maurio v. Mereck Constr. Co., 162 N.J. Super. 566, 569 (App. Div. 1978)). "However, the logical predicates for and conclusions from statements made in the report are not foreclosed" because the adversary is permitted to discover the basis for the opinion through a myriad of ways, including cross-examination, interrogatories, and depositions. Id. at 171-72.

In McCalla, the plaintiff brought a products-liability action against a crane

A-0249-23

manufacturer. Id. at 163. The defendant proffered a mechanical engineer to support its contention the crane had no design defects, but the plaintiff objected to the expert's testimony on the ground the expert report was conclusory and not based on any disclosed factual data. Id. at 164. The trial court limited the expert's testimony to "a negation of the claims of [the] plaintiff's expert" and barred the defendant's expert from testifying "this was a safe machine or that this machine met the highest standards." Ibid. We reversed, reasoning the plaintiff "had no right to . . . object to the admission of the materials that were fairly obtainable through interrogatories or depositions, and which logically flowed from the expert report already provided." Id. at 172.

Similarly, while Dr. Montilus's testimony that Boyd would have died but for the oxygen treatment was not explicitly disclosed in the report, it "logically flowed from the [one-page] report already provided." Ibid. The record evinces the report Dr. Montilus prepared included "the time, and the description . . . of the event which occurred around that day." The report described Dr. Montilus's observations of Boyd, including his "labored breathing," "unconscious" state, as well as the medical team's efforts to "resuscitate" Boyd with an Ambu-bag. We agree with the trial court's observation that as an expert in general medicine, Dr. Montilus was properly permitted to assess and testify to Boyd's condition at that

11

time.

In addition, counsel for co-defendant Watson elicited on cross-examination the facts and data on which Dr. Montilus based his opinion, as the following colloquy demonstrates:

> [Defense counsel]: The difficulty in breathing that Mr. Boyd was having, what was so different about his that you were able to opine that it would have led to death?
>
> [Dr. Montilus]: His respiratory rate . . . one, and his level of hypoxemia . . . . Those are the reasons and . . . my level of training, sir. I've been doing this for a long, long time.
>
> [Defense counsel]: So, you're able to do the evaluation and say he needs oxygen, right?
>
> [Dr. Montilus]: Yes.
>
> [Defense counsel]: Because an individual who has just gone through trauma, right, who is struggling with breathing will benefit from additional oxygen, right? That's just very basic simple, right?
>
> [Dr. Montilus]: Yes.
>
> [Defense counsel]: Okay. Was there anything else beyond that that you saw about him beyond his breathing difficulties that led you to the conclusion that this man would die?
>
> [Dr. Montilus]: His level of respiratory distress was such that . . . if he wasn't provided protection for his airway, to protect his airway from the secretion, and also he wasn't provided enriched oxygen to elevate the

A-0249-23

oxygen saturation in his blood, the degree of cerebral damage -- cervical damage and organ damage that was sustained would have been very hard to survive with that.

"Since this inquiry was open to" defendants on cross-examination, "it should not [be] foreclosed to [the State] on direct examination." McCalla, 215 N.J. Super. at 172.

Defendant's assertion the video recording allowed the jury "to draw its own conclusion" and thereby rendered Dr. Montilus's testimony unnecessary is without merit. The prosecution played for the jury videotaped recordings of the incident to substantiate Dr. Montilus's evaluation of Boyd and the medical team's efforts to resuscitate him. The video corroborated the State's position that Boyd was unconscious with labored breathing, requiring extensive oxygen.

Our courts "have permitted experts, with appropriate qualifications, to explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury." State v. McLean, 205 N.J. 438, 460 (2011). That a lay person, as noted by the trial court, "can draw their own conclusion as to a person who sustained the type of beating and attack" did not preclude Dr. Montilus from explaining the implications of Boyd's injuries to a degree of medical certainty. Thus, Dr. Montilus's opinion testimony was helpful to the jury without usurping its function as the ultimate fact-finder.

13

Lastly, we are satisfied Dr. Montilus's testimony did not opine on an element of attempted murder by "effectively telling the jury" the "injuries inflicted created a substantial risk of death."  As the State observes, "a conviction for attempted murder does not require as one of its elements that any injury be inflicted."  State v. Noble, 398 N.J. Super. 574, 599 (App. Div. 2008). Moreover, any error resulting from permitting Dr. Montilus to provide opinion testimony was harmless in light of corroborating evidence supporting the same conclusion.  See State v. Derry, 250 N.J. 611, 636 (2022) (holding any error resulting from the trial court improperly admitting opinion testimony was harmless in light of "the overwhelming evidence" against the defendants). Additionally, Dr. Sheikh specifically testified acute low levels of oxygen ultimately would have resulted in Boyd's death.

Where, as here, defendant was not unduly prejudiced by Dr. Montilus's testimony and there is no proof the State intended to mislead the jury, the trial court properly exercised its discretionary powers in admitting the testimony. See State v. Heisler, 422 N.J. Super. 399, 415 (App. Div. 2011) (holding the exclusion of improper expert testimony is not mandatory under Rule 7:7-7(b)(1) but is rather subject to the discretion of the trial court).

We are satisfied the trial court did not abuse its discretion in permitting

14

Dr. Montilus to provide "a medical opinion" that is "based on his report or notes" or is corroborated by other admissible evidence. For reasons outlined above, the trial court did not abuse its discretion in denying the motion for a mistrial.

Lesser-Included Offense

A trial court's "failure to instruct the jury on a lesser included offense that a defendant has requested" warrants reversal of a defendant's conviction only if "the evidence provides a rational basis" for the charge. State v. Dunbrack, 245 N.J. 531, 545 (2021) (quoting State v. Savage, 172 N.J. 374, 397-98 (2002)).

A key purpose of charging lesser-included offenses is to guard against the prospect that "a jury reluctant to acquit defendant might compromise on a verdict of guilt on the greater offense." State v. Sloane, 111 N.J. 293, 299 (1988). "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." Keeble v. United States, 412 U.S. 205, 212-13 (1973) (emphasis in original); see also State v. Jenkins, 178 N.J. 347, 363-64 (2004) (sustaining vacation of the defendant's murder conviction because the trial court's failure to properly instruct the jury on lesser included offenses constituted reversible error).

Defendant maintains "the passion/provocation instruction was warranted"

because Boyd committed a battery by spitting on the inmates and "instigated" a "mutual" fight. The State contends Boyd's actions were not directed at defendant, nor were they sufficient to provoke defendant.

Pursuant to N.J.S.A. 2C:1-8(e), "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Although "[a] defendant is entitled to an instruction on a lesser offense supported by the evidence regardless of whether that charge is consistent with" his defense theory, "sheer speculation does not constitute a rational basis." State v. Brent, 137 N.J. 107, 118 (1994) (citations omitted). Thus, a trial court need not charge the jury on attempted passion/provocation manslaughter at a defendant's request if the charge is "inconsistent with [his] testimony" and "the State's version of the [events,]" and "is substantiated by no testimony in the record." State v. Crisantos, 102 N.J. 265, 280 (1986) (emphasis in original).

Pertinently, the passion/provocation offense "contains all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability." State v. Robinson, 136 N.J. 476, 482 (1994).

> In our jurisprudence, attempted
> passion/provocation manslaughter is comprised of four

16

elements: "[1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying." The first two criteria are objective, and the latter two are subjective.

[State v. Funderburg, 225 N.J. 66, 80 (2016) (alterations in original) (quoting State v. Mauricio, 117 N.J. 402, 411 (1990)).]

The first inquiry is whether a reasonable person in the defendant's position would have been sufficiently provoked to "arouse the passions of an ordinary man beyond the power of his control." State v. King, 37 N.J. 285, 301-02 (1962). In other words, "[t]he adequacy of provocation is measured by whether 'loss of self-control is a reasonable reaction.'" Canfield, 470 N.J. Super. at 276 (quoting State v. Foglia, 415 N.J. Super. 106, 126 (App. Div. 2010)). "The generally-accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter." Crisantos, 102 N.J. at 274 (citations omitted). Although battery "has traditionally been considered, almost as a matter of law, to be sufficiently provocative," a physical touching that amounts to "a light blow" does not constitute adequate provocation. Robinson, 136 N.J. at 492 (quoting Mauricio, 117 N.J. at 414).

Following careful review of the record, we conclude there was no adequate evidence of provocation to warrant a passion/provocation charge. To begin, there is a question of whether Boyd was "spoiling for a fight" with defendant. Boyd's initial statements expressing a desire to fight were made in Officer Alvarado's presence on the second floor, where none of the defendants were located. Nothing in the record suggests the remarks were directed at any specific individual; rather, they appear to have been general in nature. Boyd's subsequent fighting words were directed to many individuals as he ran about, spitting and cursing.

Spitting does not "arouse the passions of an ordinary man," King, 37 N.J. at 301-02, such that he would lose his self-control, Canfield, 470 N.J. Super. at 276. While spitting may constitute a battery, it is of a lesser magnitude than "a light blow," which courts have consistently held do not constitute adequate provocation. Robinson, 136 N.J. at 492. Further, "words alone, no matter how offensive or insulting, do not constitute adequate provocation." Crisantos, 102 N.J. at 274.

In addition, "although mutual combat under certain circumstances can constitute adequate provocation to reduce murder to manslaughter, the provocation must be proportionate to the manner of retaliation." State v.

18

Darrian, 255 N.J. Super. 435, 449 (App. Div. 1992).  Most notably, the mutual combat initially involved only three parties: Boyd, Jackson, and Watson; defendant joined the fight of his own volition:

> [Prosecutor]:  When the altercation happened, was it just Boyd, Watson, and Jackson fighting, or were other people fighting, too?
>
> [Alvarado]:  No.  Shortly after they began fighting, multiple other inmates <u>rushed forward and were involved.</u>
>
> [Prosecutor]:  Who were the other people that were involved?
>
> . . . .
>
> [Alvarado]:  So I think it was Anderson at first, and then Tyshon Armour, Asencio, Hutchins, and <u>Lockett</u>.
>
> [(Emphases added).]

Finally, while "the assault on Boyd began as a mutual fight," the record evinces that defendant, along with co-defendants, continued to attack Boyd long after he was unconscious and motionless.  Specifically, while Boyd was unconscious, defendant punched him, stomped on him, struck him with a juice container and broomsticks, and threw a water cooler and a microwave at his head.

Thus, defendant's voluntary participation in the fight and his subsequent

A-0249-23

disproportionate response precluded a verdict of attempted passion/provocation manslaughter. See Darrian, 255 N.J. Super. at 449 ("[I]f a defendant on a slight provocation attacked the victim with violence out of proportion to the provocation, the crime is murder.") (citing Crisantos, 102 N.J. at 380 n. 12).

We thus perceive no error in the trial court's articulated reasons for rejecting an attempted passion/provocation manslaughter charge:

> In this particular case, as the case law indicated, words alone do not rise to a level of provocation that would be sufficient. So even if the expected testimony later on is that Mr. Branch testified that Mr. Boyd said, suck my d*ck, that would not be sufficient passion provocation under the law for a person to react or to be justified as a passion provocation.
>
> Spitting, if that's going to come out, would a reasonable person respond to that provocation in the way we have here? I don't see it. I just don't see that under a reasonable person standard or perspective for the first two elements, whether or not there was adequate provocation, I just don't see how a reasonable person would have reacted to such alleged provocation and whether or not they had time to cool off.
>
> So ultimately since I don't see how any reasonable person could have reacted to such provocation based upon State v. Canfield, this court is not going to permit the lesser included offense of passion prov[ocation], attempted passion prov[ocation] manslaughter.

In sum, because there was no rational basis for the attempted passion/provocation manslaughter charge, the trial court did not err in declining to submit that charge to the jury.

<u>Sentencing</u>

Before sentence in this case on appeal, defendant pleaded guilty to charges of conspiracy to commit murder, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, and receiving stolen property in relation to a homicide that occurred on January 11, 2019. For those offenses, defendant was sentenced in February 2023 to a term of incarceration of twelve years subject to NERA.

Defendant argues in imposing his sentence, the trial court failed to consider mitigating factors three (strong provocation) and five (victim's conduct) and "did not adequately consider the real time consequences of the sentence being imposed" as mandated by <u>State v. Marinez</u>, 370 N.J. Super. 49, 58-59 (App. Div. 2004). The State maintains we should defer to the trial court's sentencing decision, which was supported by credible evidence and findings placed on the record.

"Appellate review of a criminal sentence is limited; a reviewing court decides whether there is a 'clear showing of abuse of discretion.'" <u>State v.</u>

Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)).

> Appellate courts must affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not "based upon competent credible evidence in the record;" or (3) "the application of the guidelines to the facts" of the case "shock[s] the judicial conscience."
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In determining whether to impose concurrent or consecutive sentences, a sentencing court should consider the guidelines delineated in State v. Yarbough, 100 N.J. 627, 643-44 (1985). Namely, it should consider "whether the crimes were independent of each other, if separate acts of violence were involved, if they constituted a single period of aberrant behavior[,] and if multiple victims were involved." Marinez, 370 N.J. Super. at 59. So long as the sentencing court "place[d] on the record its statement of reasons for the decision to impose consecutive sentences, which . . . should focus 'on the fairness of the overall sentence, and . . . set forth in detail its reasons for concluding that a particular sentence is warranted,'" this court must defer to the sentencing court. State v. Torres, 246 N.J. 246, 267-68 (2021) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

A review of the sentencing hearing and judgment of conviction reveal that the trial court consulted the Yarbough guidelines, determined a consecutive sentence is warranted, and placed on record its reasons for imposing the twenty-year NERA term. Specifically, the court found:

> Yarbough also cautions the [c]ourt that there shall be no double counting of aggravating factors. Now, also, the [c]ourt should indicate whether or not the sentence, the overall fairness of the sentence, if the [c]ourt's going to impose either a concurrent or consecutive sentence. . . .
>
> Now, Judge Raven sentenced you earlier this year, on February 17th, to 12 years, pursuant to NERA . . . .
>
> This case, which took place at the Essex County Jail, more than three years later, on September 23rd, 2021, involved, obviously, a separate victim, Mr. Jayshawn Boyd. There's no similarities whatsoever between these two cases, so when we look over these Yarbough factors, [number one] is that there should be no free crime in a system for which the punishment shall fit the crime. This, most certainly, if the [c]ourt were to impose a concurrent sentence, would be, in essence, a free crime for you.
>
> Now, when we look at these guidelines, [were] the crimes in their objectives . . . predominantly independent of each other. They were most certainly independent of each other. They had nothing to do with one another. Whether or not they involve separate acts of violence or threats of violence. Completely separate acts of violence. Whether or not the crimes were committed at different times, separate places. They

23

were committed at different times, three years apart, separate places. One was out here in the streets of Newark, on Hunterdon Street, the other was inside the confines of the Essex County Jail.

Whether or not the crimes involved multiple victims. Well, we certainly have separate victims in these two crimes. There are no similarities between these two crimes. It would be an injustice if this [c]ourt were to impose a concurrent sentence on you in light of all of the Yarbough factors that I just reviewed and that the Prosecutor set forth. So for that reason, the [c]ourt, when it does impose its sentence, would be imposing a consecutive sentence.

Moreover, regarding mitigating factors three and five, the court observed:

Mitigating factor [three] is that you acted under strong provocation. Again, there was a difference of perhaps testimony, that Mr. Boyd, who just got to the pod where you were that very same day, just hours before; yes, he was walking around outside where he shouldn't have been; yes, the guard told him to return to his cell; yes, he was not listening to the guard; and maybe he mouthed off at you and the others, and for that he took that initial beating, where he was knocked unconscious. But again, as I said, that's where the savage part just began, and he certainly did not provoke anything to justify what happened to him, so I don't find that you acted under strong provocation.

. . . .

[Five], that the victim induced or facilitated its commission. Again, I cannot find that.

A-0249-23

Boyd's actions did not constitute "strong provocation."   See N.J.S.A. 2C:44-1(b)(3).  The evidence shows defendant chose to join a fight in which he was not initially involved and continued to assault Boyd with disproportionate force long after Boyd had lost consciousness.  That conduct forecloses any provocation claim.  Although Boyd may have engaged in mutual fighting with Jackson and Watson, he did not initiate or facilitate the commission of defendant's conduct.  See N.J.S.A. 2C:44-1(b)(5).

Because the sentencing court properly identified and weighed the aggravating and mitigating factors, assessed the overall fairness of the sentence imposed, and placed its reasoning on the record, this court may not substitute its judgment for that of the sentencing court.  Torres, 246 N.J. at 267-68.

In sum, we are satisfied the trial court did not abuse its discretion by permitting Dr. Montilus to offer his opinion testimony and denying the motion for mistrial on that ground.  The trial court also did not err in declining to instruct the jury on attempted passion/provocation manslaughter and did not abuse its discretion in imposing sentence.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0249-23