**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4010-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARIO GAYLES, a/k/a
AMEIR CONNEL, and
MARIO GILLS,

    Defendant-Appellant.

_____

> Argued telephonically June 3, 2020 –
> Decided August 4, 2020
>
> Before Judges Koblitz, Gooden Brown, and Mawla.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 16-02-0637.
>
> Whitney Faith Flanagan, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Whitney Faith Flanagan, of counsel and on the brief).
>
> Hannah Faye Kurt, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney for respondent; Hannah Faye Kurt, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, defendant was convicted of first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2), (count one); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three). The convictions stemmed from defendant fatally shooting an associate following a physical altercation on the street, during which the associate assaulted defendant. After the assault, defendant left the area but returned shortly thereafter, shot the associate, and fled on foot. The State's proofs included accounts from two eyewitnesses who had known defendant and the victim for nearly two decades, as well as surveillance video of the shooting from different security cameras in the area. The trial court denied defendant's pre-trial Miranda[1] motion to exclude his statement to detectives, in which he admitted selling drugs with the victim and having disagreements with him over money, but denied shooting him. The court also granted the State's in limine motion to

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

introduce evidence of the victim's and defendant's drug dealing activities pursuant to N.J.R.E. 404(b). Although defendant denied shooting the victim in his statement, at trial, his defense was that he committed passion/provocation manslaughter, not murder.

On January 26, 2018, defendant received an aggregate sentence of life imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[2] He now appeals from the February 5, 2018 conforming judgment of conviction. In his counseled brief, defendant raises the following points for our consideration:

> POINT I
>
> BECAUSE PROVOCATION WAS THE CENTRAL ISSUE IN THE CASE, THE TRIAL COURT'S REFUSAL TO TAILOR THE PASSION/PROVOCATION INSTRUCTION DENIED [DEFENDANT] A FAIR TRIAL.
>
> POINT II
>
> BECAUSE [DEFENDANT]'S MENTAL STATE WAS IN DISPUTE, THE TRIAL COURT'S REFUSAL TO TAILOR THE FLIGHT INSTRUCTION DENIED [DEFENDANT] A FAIR TRIAL.

---

[2] "[NERA] requires that each defendant sentenced to life imprisonment serve sixty-three and three-quarters years before parole eligibility." State v. Fortin, 400 N.J. Super. 434, 449 n.5 (App. Div. 2008); see N.J.S.A. 2C:43-7.2(b).

POINT III

PERVASIVE PROSECUTORIAL MISCONDUCT DENIED [DEFENDANT] A FAIR TRIAL

A. THE PROSECUTOR'S REPEATED MISREPRESENTATIONS OF THE EVIDENCE IN SUMMATION DENIED [DEFENDANT] A FAIR TRIAL.

B. THE PROSECUTOR'S REPEATED DENIGRATIONS OF THE DEFENSE AND DEFENSE COUNSEL DENIED [DEFENDANT] A FAIR TRIAL.

C. THE PROSECUTOR'S COMMENT ON [DEFENDANT]'S DECISION NOT TO TESTIFY DENIED [DEFENDANT] A FAIR TRIAL.

D. THE COMBINATION OF REPEATED COMMENTS DENIGRATING THE DEFENSE, MISREPRESENTING THE EVIDENCE, AND DRAWING ATTENTION TO [DEFENDANT]'S DECISION NOT TO TESTIFY WARRANT REVERSAL.

POINT IV

THE ERRONEOUS ADMISSION OF OTHER-CRIMES EVIDENCE THAT [DEFENDANT] WAS A DRUG DEALER DENIED HIM A FAIR TRIAL.

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED

4

DEFENDANT A FAIR TRIAL. (NOT RAISED BELOW).

POINT VI

[DEFENDANT]'S SENTENCE OF LIFE IMPRISONMENT IS MANIFESTLY EXCESSIVE.

In his pro se brief, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT'S FAILURE TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER AND RECKLESS MANSLAUGHTER DEPRIVED [DEFENDANT] OF DUE PROCESS AND [DEFENDANT'S] RIGHT TO A FAIR TRIAL. . . . (NOT RAISED BELOW).

A. DEFENSE COUNSEL FAILED TO OBJECT FOR LESSER INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER AND RECKLESS MANSLAUGHTER JURY CHARGE.

POINT II

[DEFENDANT] WAS DENIED A FAIR TRIAL BECAUSE THE PROSECUTOR FAILED TO DISCLOSE A PSYCHIATRIC REPORT WHICH INDICATED THE STATE'S WITNESS WAS INCOMPETENT TO STAND TRIAL FOR SEVERE PSYCHIATRIC CONCERNS AND SUICIDAL IDEATION. (NOT RAISED BELOW).

A. THE EVIDENCE WITHHELD CONSTITUTES NEWLY DISCOVERED EVIDENCE.

Having considered the arguments and applicable law, we affirm.

I.

We glean these facts from the trial record. At approximately 10:00 p.m. on July 15, 2015, while walking to the store to get cigarettes, Francine Wilson observed defendant shoot Icrish Bostic on the corner of Springfield Avenue and Durand Place in Irvington. At the time of the shooting, Wilson had known defendant for approximately eighteen years. She testified that she "used to be an addict" and would "buy [drugs] from [defendant]." She met Bostic "around the same time" as defendant, and knew Bostic from "being on the streets" and buying drugs from him as well.

Just prior to the shooting, as Wilson approached the corner, she had observed a man she had "never seen before" shoving and arguing with Bostic, while Bostic just "walk[ed] real slow, . . . [not] saying anything." After the shooting, "[o]nce [Bostic] fell" to the ground, Wilson stated "[defendant] got a little closer," and "shot [him] up." When the shooting finally stopped, Wilson "panicked" and "crawled under [a] car" that "was at the corner."

A-4010-17T4

According to Wilson, earlier in the afternoon on the day of the shooting, while she and defendant were in the car of a mutual friend, defendant started "fussing" about Bostic, saying that he was "tired of him" and that he was "going to kill him." Wilson testified that the mutual friend cautioned defendant not to "say that," and told defendant he did not "mean that" because he and Bostic were "real good friends." Defendant and Bostic "grew up together" and Wilson believed they "were very close." Wilson explained that although "[t]hey argued," usually "when they were drinking,"[3] they "still hung together."

Magdy Mohammed, who owned a pizzeria on the corner of Springfield Avenue and Durand Place, also witnessed the shooting outside of his pizzeria and identified defendant as the shooter. According to Mohammed, a little after 10:00 p.m. on July 15, while he was carrying bags from his car to his store, he observed defendant and Bostic fighting but "somebody g[o]t involved and [broke up] the fight."[4] Shortly thereafter, while Mohammed was "smok[ing] a cigarette" outside his pizzeria, he observed defendant holding a gun, "lift his arm, and . . . start shooting" at Bostic. After hearing "three shots," Mohammed

---

[3] Wilson described Bostic as "an alcoholic" who had "anger issues" when he was drinking.

[4] Both Mohammed and Wilson acknowledged that Bostic was much bigger than defendant.

left, afraid that defendant would "shoot [him] too" because "[he] saw what happened."

Like Wilson, Mohammed testified that he had also known defendant and Bostic for approximately eighteen years before the shooting. According to Mohammed, he would observe them "[j]ust hanging out" in front of his store. Although he "saw . . . people . . . hand them money [sometimes]," and they handed something back in return, he "[did not] know what [it was]." Mohammed believed that defendant and Bostic were friends and "may have lived together."

Irvington Detective Christopher Burrell was one of the first officers to respond to the scene of the shooting. Upon arrival, he found Bostic "lying on the sidewalk face down bleeding from the head." Bostic was pronounced dead at the scene and removed by the Medical Examiner, where a subsequent autopsy revealed a total of "nine" gunshot wounds, three to the head. The cause of death was reported as "multiple gunshot wounds to [the] head, torso, and extremities," and the "manner [of death was] homicide."[5]

Along with other responding officers, Burrell secured the scene, identified shell casings, canvassed for witnesses, and located surveillance videos from

---

[5] The toxicology analysis showed that Bostic's blood alcohol level was above the legal limit to drive.

security cameras in the area, including Mohammed's pizzeria, before turning the case over to the Essex County Prosecutor's Office (ECPO) Crime Scene Unit. An ECPO detective recovered five projectiles and eleven 9-millimeter shell casings, all of which were "discharged" from the same firearm, "a 9[-]millimeter, semiautomatic."

The surveillance videos captured the shooting from different angles, and corroborated the accounts of the two eyewitnesses. In one surveillance video, Bostic and an unidentified male are depicted engaged in a "verbal dispute." When defendant "[came] into the scene on the video," a "physical altercation occur[ed] between . . . Bostic and [defendant]." Bostic, who, based on the Medical Examiner's report "weighed approximately 275 pounds," initiated the fight and "punch[ed defendant] in the face." Bostic then "grab[bed defendant] from behind," and "thr[e]w him to the ground," pulling defendant's "hair while he [was] on the ground."

The video showed defendant then leaving the area and going "around the corner" onto Durand Place, with Bostic following in that direction. Another surveillance video showed defendant "passing . . . in front of the camera" on Durand Place, "then a minute or so later com[ing] right back around the corner with a handgun in his [right] hand." After defendant came back from around the

corner holding the gun, he "shot the first shot" at Bostic. When Bostic "fell to the ground," defendant walked towards Bostic and continued to shoot at him. Afterwards, another surveillance video "capture[d defendant] fleeing onto Durand Place" and "go[ing] up into a property on the right side." Defendant then "c[a]me back out into the street area" and "[ran] away . . . on Durand Place."

Based on the eyewitness accounts and the surveillance videos, on July 17, 2015, a warrant was issued for defendant's arrest. Approximately one week later, on July 25, 2015, defendant was arrested in Crawford County, Pennsylvania, a six to seven-hour drive from Irvington. After waiving his Miranda rights, defendant was interviewed by ECPO Detective Wilfredo Perez and his partner at the Crawford County jail. Initially, defendant told Perez that he had arrived in Pennsylvania on July 11, four days before the shooting, and had been staying with his cousin after being driven there by a friend.[6] Defendant also stated he lived in Trenton, not Irvington.

Defendant eventually admitted hearing about a "dude that got killed" in Irvington, and stated that the decedent, Bostic, had been "[a] friend of [his]." Defendant described his relationship with Bostic as being "about money and

---

[6] During the trial, Quiana Bowman, the friend defendant claimed drove him to Pennsylvania, denied "driving . . . to Crawford County, Pennsylvania" any time "in July of 2015." She also denied having a driver's license or owning a car.

friendship." He admitted that he had sold drugs with Bostic in Irvington, around Durand Place and Springfield Avenue, and that Bostic "used to live with [him]." Defendant also stated that he had disagreements with Bostic because Bostic was "an alcoholic" and "drank too much."

Usually, according to defendant, the fights "came about because of money." Defendant described two such recent physical fights with Bostic as follows:

> [T]he first one happened I kicked his ass . . . . We fought. Police came. . . .
>
> And the second time we get into a fight he started terrorizing the neighborhood . . . people on the corner . . . and all that. Somebody went and call the police. I'm looking at this is my place of business where I eat at, so I go try to talk to him, like, 'Yo, relax, calm the fuck down'. He telling me, 'Well, I'm on the east side,' this that . . . . I don't have none of that shit. When I try to walk off, he sneaks me from the back. When he sneaks me, I turn around, kicked his ass, you know what I mean, because he can't fight. I kick his ass. There was a couple people out there. He try and grab hair and all that.
>
> So . . . . [w]e go in the back yard. I fuck him up. Boom, that was that.

According to defendant, Bostic could not "beat [him], so why should he matter to [him]?" Defendant stated that because Bostic "never [saw] nobody else come up, . . . he think[s] everything's supposed to be for him" and "he didn't

11

want to see nobody else get money." Despite the fights, defendant stated he "personally, . . . [paid] . . . no attention" to Bostic and "never had no [serious] beef with [Bostic], . . . for this type of situation to occur." He explained that Bostic could not "stop what [defendant did] . . . . [b]ecause people [did not] want to deal with [Bostic]; they'd rather deal with [defendant] because [defendant was] more respectful than [Bostic's] ass [was]."

Defendant stated his only "problem" with Bostic "was when he started acting like that towards other people," like "store owners." Defendant explained that when the store owners "call[ed] the police," defendant's ability "to make money" was adversely impacted. Defendant denied killing Bostic, and stated that although they "continuously . . . g[o]t in[to] . . . fight[s,] . . . the next day . . . [he was his] man" and "would still spend the night at [defendant's] house." Defendant suggested that Perez "look at other people that [Bostic] was beefing with . . . around the area."

After the State rested, defendant elected not to testify at the trial. In summations, defense counsel maintained that defendant committed passion/provocation manslaughter, not murder. Thereafter, the jury returned a verdict of guilty to murder and the related weapons offenses, and this appeal followed.

II.

In Point I of his counseled brief, defendant argues the trial judge denied him "a fair trial" by rejecting his request to "instruct the jury that it could consider the history of physical altercations between [defendant] and Bostic in its determination of whether [defendant] was reasonably provoked by Bostic's assault." We disagree.

It is well-settled that "[c]lear and correct jury instructions are essential for a fair trial." State v. Randolph, 441 N.J. Super. 533, 558 (App. Div. 2015) (quoting State v. Brown, 138 N.J. 481, 522 (1994)). Because "[t]he trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find,'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)), courts have an "independent duty . . . to ensure that the jurors receive accurate instructions . . . , irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004). As "an indication of the paramount importance of accurate jury instructions," our Supreme Court has "held that erroneous instructions on material issues are presumed to be reversible error." Ibid. (quoting State v. Marshall, 173 N.J. 343, 359 (2002)).

Where, as here, the challenge is not to the legal accuracy of the jury instruction, which comported with the model jury charge, but to the adequacy of the charge in light of the denial of the defendant's request to mold or tailor the model jury charge to the facts of the case, we apply a harmless error analysis. See R. 2:10-2. "Under that standard, there must 'be "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."'" Baum, 224 N.J. 147, 159 (alterations in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)); see also State v. Macon, 57 N.J. 325, 337-38 (1971) ("The question is whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction."). "Our review, moreover, must not lose sight of the distinction between instructions that are legally incorrect and those that are merely 'capable of being improved.'" State v. Cagno, 211 N.J. 488, 514-15 (2012) (quoting State v. Delibero, 149 N.J. 90, 106 (1997)).

While "[n]o party is entitled to have the jury charged in his or her own words," State v. Jordan, 147 N.J. 409, 422 (1997), a trial judge may be required in certain situations to mold or tailor the model jury charge "in a manner that explains the law to the jury in the context of the material facts of the case." State

v. Concepcion, 111 N.J. 373, 379 (1988). "That requirement has been imposed in various contexts in which the statement of relevant law, when divorced from the facts, was potentially confusing or misleading to the jury." State v. Robinson, 165 N.J. 32, 42 (2000). In such instances, "the trial court was required to explain an abstract issue of law in view of the facts of the case." Id. at 43. However, "we generally leave it to the sound discretion of the trial judge to decide when and how to comment on the evidence." State v. Pigueiras, 344 N.J. Super. 297, 317 (App. Div. 2001) (citing Robinson, 165 N.J. at 45).

"In New Jersey a purposeful killing can be either murder or passion/provocation manslaughter." State v. Coyle, 119 N.J. 194, 221 (1990). "When the record contains evidence of passion/provocation, the State can obtain a murder conviction only if it proves beyond a reasonable doubt that the purposeful killing was not the product of passion/provocation." Ibid. "If there is sufficient evidence of passion/provocation, a trial court must instruct the jury that 'to find murder it must be convinced beyond a reasonable doubt that the accused did not kill in the heat of passion.'" Id. at 221-22 (quoting State v. Grunow, 102 N.J. 133, 145 (1986)).

> A homicide which would otherwise be a purposeful or knowing murder, that is committed in the heat of passion resulting from a reasonable provocation, is reduced to passion/provocation manslaughter, so long

15

as the killing occurs before sufficient time has passed that an ordinary person in similar circumstances would have cooled off.

[State v. Viera, 346 N.J. Super. 198, 212 (App. Div. 2001) (citing N.J.S.A. 2C:11-4(b)(2)).]

Thus, to establish passion/provocation manslaughter, "the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying." State v. Mauricio, 117 N.J. 402, 411 (1990). "The first two criteria are objective," while "the other two are subjective." Viera, 346 N.J. Super. at 212.

To find the first criterion, that "the provocation was adequate," a jury must "conclude that the loss of self-control was a reasonable reaction." Ibid. "Stated another way," the jury must conclude that "'the asserted provocation was []sufficient to inflame the passions of a reasonable person.'" Ibid. (quoting Mauricio, 117 N.J. at 412). To find "[t]he third criterion, . . . the provocation must actually have impassioned the perpetrator." Id. at 213.

It is well settled that when there is evidence of prior physical abuse of defendant by the decedent, the jury must be told that a finding of provocation may be premised on "a course of ill treatment which can induce a homicidal response in a person of ordinary firmness

16

and which the accused reasonably believes is likely to continue."

[State v. Kelly, 97 N.J. 178, 218-19 (1984) (quoting State v. Guido, 40 N.J. 191, 211 (1963)).]

While we have acknowledged that such cases typically "involve[] a continued course of physical abuse involving persons in a familial relationship," we have "decline[d] to hold that a familial relationship is necessary" to find "a course of ill-treatment . . . sufficient" to establish "adequate provocation." Viera, 346 N.J. Super. at 216.

Here, during the charge conference, relying on Coyle, defense counsel requested that the judge tailor the passion/provocation charge and instruct the jury that "reasonable provocation can be a continuing course of ill treatment by the decedent against the defendant." Defense counsel asserted that given the "continuing pattern of fighting between the [victim and defendant]," the charge was appropriate. The prosecutor objected, stating that the charge was "completely inappropriate" because "[t]he evidence" showed "fighting back and forth" between defendant and the victim, not "ill treatment" or "abuse or . . . anything like that."

The judge denied defense counsel's request, explaining:

> I considered defendant's argument as to including some language pursuant to State v. Coyle, as to a pattern of

ill treatment. I don't see that as the case here. . . . I think, here, you have a situation where both individuals, defendant and victim, knew each other for quite a long period of time, according to the witnesses that knew them.

According to . . . defendant, they had a couple of fights in the past. Defendant claims he got the best of . . . the victim in the past. But certainly no one testified as to any type of continuing course of ill treatment by the victim towards . . . defendant. I don't see any pattern here of that. A couple of skirmishes in the past, maybe, but no . . . evidence that anything was out of the ordinary, or that it was a one-sided physical relationship. So I will not include the proposed additional charge.

However, over the prosecutor's objection, the judge concluded that the evidence showing that "prior to the shooting," defendant was "somewhat easily manhandled by the victim," who was "considerably heavier and larger than . . . . defendant" justified charging the standard passion/provocation charge. Thereafter, the judge instructed the jury on passion/provocation manslaughter, tracking the model charge. See Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3a(1) and (2); 2C:11-4(a), (b)(1) and (b)(2))" (rev. June 8, 2015); see also State v. R.B., 183 N.J. 308, 325 (2005) ("[I]nsofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury."); Estate of Kotsovska, ex rel. Kotsovska v.

Liebman, 221 N.J. 568, 596 (2015) (noting that a "presumption of propriety . . . attaches to a trial court's reliance on the model jury charge" when it is used for "the specific purpose for which [it] was adopted").

We are satisfied the judge properly provided the standard model jury charge for passion/provocation manslaughter, and correctly exercised his discretion in denying defendant's request to tailor the charge. In Coyle, our Supreme Court reversed the defendant's murder conviction partly because the trial judge failed to tailor the charge to indicate the existence of "prolonged abuse culminating in a killing." 119 N.J. at 226. The Court found that because there was "evidence that the decedent ha[d], in the past, consistently physically abused one with whom the defendant [stood] in close relationship," and "the defendant kn[ew] of that abuse, 'the jury [should have been] told that a finding of provocation may be premised on "a course of ill treatment which [could] induce a homicidal response in a person of ordinary firmness and which the accused reasonably believe[d was] likely to continue."'" Id. at 227 (quoting Kelly, 97 N.J. at 219). The Court reasoned that "[a]bsent [this] detailed instruction, a jury might not make an informed decision on the passion/provocation manslaughter issue." Id. at 228; see also State v. Lamb, 71 N.J. 545, 551 (1976) ("Since there was evidence of prior repeated physical

mistreatment of defendant by decedent, including threats to her life, . . . the jury should have been instructed . . . to consider not only decedent's conduct and threats that night, but also his prior mistreatment of defendant" in determining the question of provocation.).

Here, unlike Coyle, there was no evidence of the victim's ill treatment or prolonged abuse of defendant or someone close to defendant. Instead, there was evidence of prior physical fights, during which defendant admittedly had the upper hand. Indeed, defendant bragged about beating the victim in the past, expressed no fear of him, and acknowledged that although "[t]hey argued, . . . they still hung together." In these circumstances, it was the precipitating "physical confrontation" in which the victim assaulted defendant, rather than any preceding events, from which "a jury could rationally conclude that the killing was the product of passion/provocation." Coyle, 119 N.J. at 225 ("Various types of provocatory conduct have been deemed adequate, and 'battery, except for a light blow, has traditionally been considered . . . sufficiently provocative.'" (alteration in original) (quoting Mauricio, 117 N.J. at 414)). In the absence of any evidence of the victim's prior physical abuse of defendant, tailoring of the charge was not warranted. We also reject defendant's contention that the judge repeating the standard charge on reasonable

20

provocation in response to the jury's request for clarification of "reasonable provocation" was "reversible error." See Jordan, 147 N.J. at 422 (explaining that "all that is necessary is that the charge as a whole be accurate").

Defendant relies on Viera, State v. Erazo, 126 N.J. 112 (1991), and State v. Bonano, 59 N.J. 515 (1971) to support his contention that tailoring was warranted, but his reliance is misplaced. The necessity to tailor the jury charge was not addressed in any of these cases, only whether the evidence provided a rational basis for a passion/provocation charge, an issue that is not in dispute in this case. Viera, 346 N.J. Super. at 217; Erazo, 126 N.J. at 124; Bonano, 59 N.J. at 523-24.

### III.

In Point II of his counseled brief, defendant argues that the judge's "[f]ailure to instruct on the nuances of flight under the facts of this case rendered the instruction inadequate" and the error "reversible." We disagree.

At the charge conference, defendant did not object to a flight charge since defendant was "conceding consciousness of guilt," and asked the judge to omit the language indicating that "defendant denie[d] any flight," to which the judge agreed. However, defense counsel requested that the instruction be tailored to include the following language:

[D]efendant does not contest that he fled or that he fled because he committed a crime. As you are now aware, the defendant concedes that he is guilty of the crime of heat of passion/provocation manslaughter [and] the weapons offenses. Flight can only be used in considering whether the defendant committed a crime, not which crime he committed.

The prosecutor objected to the proposed language as "being argument and summation." The judge agreed with the prosecutor, and, tracking the model jury charge on flight, Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010), later instructed the jury as follows:

Now there has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. If you find that the defendant, fearing that an accusation or arrest would be made against him on the charge involved in the indictment, took refuge in flight for the purpose of evading the accusation or arrest on that charge, then you may consider such flight in connection with all the other evidence in the case, as an indication or proof of consciousness of guilt. Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest for the offense charged in the indictment.

It is for you, as judges of the facts, to decide whether or not evidence of flight shows a consciousness of guilt and the weight to be given such evidence in light of all the other evidence in the case.

We discern no error in the judge's flight charge. Other than omitting the language denying flight as requested by defense counsel, the charge was "a verbatim recitation" of the model jury charge and "consistent with controlling New Jersey precedent." State v. Rodriguez, 365 N.J. Super. 38, 53 (App. Div. 2003); see State v. Mann, 132 N.J. 410, 418-19 (1993) ("For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." (quoting State v. Sullivan, 43 N.J. 209, 238-39 (1964))).

Defendant cites State v. Randolph, 228 N.J. 566 (2017) to support his contention that the flight charge should have been tailored to reflect that "[his] flight was indicative of his consciousness of guilt . . . to the lesser charge of manslaughter," as opposed to "the offense charged in the indictment." In Randolph, the defendant was being pursued by two different law enforcement agencies on entirely separate crimes. Id. at 593. "At the very same time that the Jersey City police was conducting its investigation and surveillance" of the defendant's building "for drug activity," the United States "Marshals were rushing to the third floor to arrest [the] defendant" on "a homicide charge." Id.

23

at 593-94. The Court thus posited that the circumstances "raise[d] the inevitable question[:] If defendant, in fact, was fleeing up the stairs, was his flight prompted by an attempt to escape detection for drug dealing or for a homicide?" Id. at 594.

> The jury never learned that the United States Marshals were on defendant's trail and arrested him in the building at the time of the Jersey City police investigation. Of course, such a disclosure would have been highly prejudicial given that defendant was on trial for drug offenses and not for committing a homicide. Because of what it did not know, the jury could not give weight to evidence that any flight might have been motivated for reasons other than the drug investigation.
>
> [Ibid.]

"[G]iven the peculiar facts in th[e] case," the Court found that in a re-trial, "the trial court must cautiously consider whether . . . a flight charge is appropriate" and "[i]n doing so, the court must determine whether the probative value of evidence of flight is 'substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury,' and whether a carefully crafted limiting instruction could ameliorate any potential prejudice." Id. at 595 (quoting N.J.R.E. 403(a)).

Contrary to defendant's assertion, the circumstances in Randolph are materially distinguishable from the facts of this case. Moreover, Randolph does

24

not invalidate the model flight charge specifying that the defendant's motivation for fleeing is prompted by "fear[] that an accusation or arrest would be made against him on the charge involved in the indictment."  While "flight from the scene for reasons unrelated to the crime charged would not be probative of guilt on that charge," here, the jury was not "left to speculate" about "defendant's motivation" because it is undisputed that defendant fled after committing a homicide.  Id. at 594-95.  Indeed, during summations, defense counsel commented:

> This is not murder.  Yes, [defendant] left.  He ran.  He went to Pennsylvania.  You'll hear the [j]udge instruct you that that could be seen as . . . a consciousness of guilt.  We're not denying that. . . .  We're standing in front of you and telling you that [defendant] is guilty of a very serious crime, the most serious crime.  And that is passion/provocation manslaughter.

Thus, there was no need to "tailor the charge to the facts of the case to prevent juror confusion."  See id. at 578 (quoting State v. Randolph, 441 N.J. Super. 533, 563-64 (App. Div. 2015)).  Because the judge gave the model jury charge for both murder and passion/provocation manslaughter, "[c]onsidering the instructions in their entirety, in the context of the evidence and the arguments of trial counsel, we are convinced that the charge was fair."  Robinson, 165 N.J. at 47; see Cagno, 211 N.J. at 514 ("This court has repeatedly held that portions

of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." (quoting State v. Wilbely, 63 N.J. 420, 422 (1973))).

IV.

In Point III of his counseled brief, defendant argues the prosecutor (a) "made repeated improper comments that were not supported by the evidence," (b) made comments "that denigrated the defense and defense counsel," and (c) made comments "that drew attention to [defendant's] election not to testify." Defendant asserts that while "the court intervened, instructing the jury on its own motion to disregard one remark," defendant was nonetheless deprived of "due process and a fair trial."

"Prosecutors can sum up cases with force and vigor, and are afforded considerable leeway so long as their comments are 'reasonably related to the scope of the evidence presented.'" State v. Pressley, 232 N.J. 587, 593 (2018) (quoting State v. Timmendequas, 161 N.J. 515, 587 (1999)). "[I]f a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" State v. Smith, 167 N.J. 158, 178 (2001) (quoting State v. Johnson, 31 N.J. 489, 510 (1960)).

"[W]hile a prosecutor must advocate a position vigorously, there are boundaries to such conduct." State v. Hawk, 327 N.J. Super. 276, 281 (App. Div. 2000). A prosecutor is "not permitted to cast unjustified aspersions on the defense or defense counsel." Smith, 167 N.J. at 177. Further, a prosecutor may not make comments "which may adversely affect an accused's Fifth Amendment rights" or "either in subtle or obvious fashion draw attention to a defendant's failure to testify." State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991).

However, "[a] prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial." State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001); see State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011) ("A prosecutor's otherwise prejudicial arguments may be deemed harmless if made in response to defense arguments."). In fact, "[a] prosecutor may respond to defense claims, even if the response tends to undermine the defense case." State v. Nelson, 173 N.J. 417, 473 (2002).

An appellate court "must assess the prosecutor's comments in the context of the entire trial record," id. at 472, including whether the trial was lengthy and the prosecutor's remarks short or "errant." Engel, 249 N.J. Super. at 382. "A finding of prosecutorial misconduct does not end a reviewing court's inquiry

because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'"  Smith, 167 N.J. at 181 (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

"Thus, to warrant a new trial the prosecutor's conduct must have been '"clearly and unmistakably improper," and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense.'"  Id. at 181-82 (quoting Timmendequas, 161 N.J. at 575).

> In determining whether a prosecutor's actions were sufficiently egregious to warrant the reversal of a conviction, a reviewing court should take into account: (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.
>
> [Id. at 182 (citations omitted).]

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial."  Timmendequas, 161 N.J. at 576.  "Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made," ibid. (citation omitted), and deprives the court of the "opportunity to take curative action."  Frost, 158 N.J. at 84.

When a defendant raises prosecutorial misconduct for the first time on appeal, we need only be concerned with "whether the remarks, if improper, substantially prejudiced the defendant['s] fundamental right to have the jury fairly evaluate the merits of [his or her] defense, and thus had a clear capacity to bring about an unjust result." Johnson, 31 N.J. at 510; see State v. Ross, 229 N.J. 389, 407 (2017) (noting that under the plain error standard of review, R. 2:10-2, "[t]he possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached'" (quoting State v. Williams, 168 N.J. 323, 336 (2001))).

A.  Comments Not Supported By The Evidence

Turning to defendant's specific contentions, first, defendant asserts the following comments were not supported by the evidence: (1) that defendant "had planted a gun in the area prior to Bostic's attack, with the intent to use it to murder him[;]" (2) "that the shooting was motivated by a 'turf battle' between [defendant] and Bostic[;]" and (3) "that [defendant] had lied in a sworn statement."

Regarding defendant secreting a gun beforehand, referring to the surveillance video that tracked defendant's path on Durand Place and Burrell's testimony that defendant approached an abandoned building on Durand Place

prior to returning with the gun, the prosecutor stated that "[t]he gun was planted [in an abandoned building] ahead of time for [defendant] to go get it and retrieve it and kill [Bostic]." Also, referring to Wilson's testimony that earlier that afternoon, defendant had told her that he was going to kill Bostic, the prosecutor stated that defendant had brought the gun to the area "to have it nearby for the murder later in the evening." Contrary to defendant's contentions, we are satisfied that these comments are reasonably related to the scope of the evidence presented, and the reasonable inferences drawn therefrom. Moreover, defense counsel interposed no objection.

Defendant also challenges the following related comments made by the prosecutor while showing the surveillance video retrieved from Mohammed's pizzeria:

> I'm gonna start it again here at the moment when . . . defendant walks across the screen. This is right after the fight. And just look at the way he's walking with his body posture. Agitated? Angry, even? Nothing. Just walking away. . . . Is he terrified? Is he going to run to get his gun? No. Because that's not the point. The point is murder. The point is getting rid of [Bostic]. . . . Calmly walking away thinking, all right, I'm gonna go get the gun, make sure it's loaded, I think I loaded it last time. . . . I'm gonna go get it, I'm gonna come back – – I guess I'll come back the same way, he'll probably still be there. Thinking it through, all this time to think through every detail of how he's gonna do it.

30

Defense counsel objected to the prosecutor's narration of defendant's train of thought, explaining to the judge that the prosecutor "put[] words into [defendant's] mouth" and improperly "indicat[ed] that he[] used this gun before." The prosecutor countered that it was "an inference that the jurors [could] draw" and response to defense counsel's claim that defendant "lost self-control," and "[was] not thinking." The judge agreed that the comment was objectionable. However, instead of adopting defendant's requested curative instruction, before giving the final charge, the judge instructed the jury in pertinent part that

> when the [p]rosecutor, in his summation, was discussing what . . . defendant may have said to himself at a certain point in time, that is his comment based on what some of the other evidence is in the case. But there is no evidence in the record of what . . . defendant or anyone else said at the time of the incident. So you cannot speculate as to what someone may have said at that point in time when you heard no evidence of it.

We agree that the comment was improper, but are satisfied that the judge's prompt, forceful, and targeted curative instruction ameliorated any prejudice to defendant. "We will presume that the jury adhered to the court's instruction." State v. Feaster, 156 N.J. 1, 65 (1998). Indeed, the comments are no more prejudicial than the statements in Feaster. There, over defendant's objection, the prosecutor argued that the defendant had loaded and cocked the gun during the car ride to the scene of the murder, a claim which "had no basis in the record

31

and was highly improper." Id. at 62. Nevertheless, the Court determined that the comments "in the context of the entire trial" did not have the capacity to deprive defendant of a fair trial. Id. at 63.

Defendant also challenges the prosecutor's references to "a 'turf battle'" and competition between defendant and Bostic. The prosecutor stated:

> [Wilson] also tells you, makes clear that they're competitors. It's not just from . . . defendant's mouth. They're selling drugs on the same street corner. [Mohammed] tells you the same thing. They're selling drugs on the same street corner, this one corner. This is a turf battle, ladies and gentlemen. This is a battle for that street corner. And this was a murder to make sure that [Bostic] no longer got more of the money. Remember, ten times, all [defendant] could talk about in the statement is money and how [Bostic] wants to have all the money.

Again, we are satisfied that these comments are reasonably related to the scope of the evidence presented, and the reasonable inferences drawn therefrom. Further, defense counsel interposed no objection. We disagree with defendant's contention on appeal that his and Bostic's friendship prevented them from being competitors. Indeed, as defendant acknowledged in his statement, his relationship with Bostic was "about money and friendship."

Defendant also challenges the prosecutor's comment that defendant "chose to give a sworn statement" to police, and argues "[t]he prosecutor's only reason

32

to claim that the statement was sworn was to present [him] as a person who lies under oath." Defense counsel objected to the prosecutor's comment and requested a curative instruction. Counsel explained that the "statement was not sworn" and the jury could be confused, having seen other witnesses come to court and give sworn testimony under oath. The prosecutor countered that defendant "swore at the end of the statement and affirmed that it was the truth." The judge replayed the pertinent portion of defendant's statement. At the conclusion of the statement, Perez asked defendant whether "everything [defendant] told [them was] the truth" as "[defendant] know[s] it," and defendant replied "[y]ep."

The judge determined that there was "a disagreement as to whether or not . . . defendant was sworn when he gave the statement to the detectives or whether he affirmed to the truth of his statement." As a result, when addressing defendant's statement in the final charge, the judge gave the following curative instruction:

> There was also for your consideration in this case a recorded statement allegedly made by . . . defendant. It is your function to determine whether or not the statement was actually made by . . . defendant, and if made, whether the statement or any portion of it is credible. It is also your function to determine whether . . . defendant swore to the truth of or affirmed the truth of the statement. In considering whether or not the

statement is credible, you should take into consideration the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue.

We are persuaded that the comment, while improper, was not so egregious as to deprive defendant of a fair trial. Indeed, the falsity of defendant's statement, in which he denied killing Bostic, was not disputed by the defense. Thus, the defense itself acknowledged that defendant had lied to the detectives. Moreover, the judge's curative instruction ameliorated any prejudice to defendant.

## B. Comments Denigrating The Defense

Next, we consider defendant's argument that the prosecutor denigrated the defense by referring to it as "ridiculous," "an 'insult to [the jury's] intelligence,'" "a 'smokescreen,'" and "a 'trap.'" Defendant also contends the prosecutor implied that defense counsel and defendant "manufactured" and "fabricated the passion/provocation defense" because they could not contest "identification." Further, according to defendant, the prosecutor "unfairly mischaracterized the defense summation" by claiming that "the defense was a mere appeal to sympathy," and that "the jury should not convict [defendant] of murder because the person he killed was a drug dealer."

34

Because defendant made no objection to these comments, we review for plain error, see R. 2:10-2, and "may infer from counsel's failure to object to the remarks at the time they were made that he [or she] did not in the atmosphere of the trial think them out of bounds." Johnson, 31 N.J. at 511; see State v. Atwater, 400 N.J. Super. 319, 337 (App. Div. 2008) ("Where there was no objection at the time, there is an inference that the defense did not view the summation as prejudicial in the context of the trial.").

Defendant cites the following comment in support of his contention that the prosecutor implied the defense was manufactured or tailored:

> Now . . . defendant can't contest identification in this case. And that goes, again, to why the argument is being made to you, the appeal for sympathy. You can't contest identification. . . . [D]efendant tried until all the evidence was obtained and set up. Crap, you know, . . . where am I going with identity? I can't say it wasn't me, actually, why did I say that, oh, geez, what am I gonna do now? So then it becomes, well, it's passion, it's provocation.

In State v. Daniels, our Supreme Court held that "prosecutors are prohibited from making generic accusations of tailoring during summation." 182 N.J. 80, 98 (2004). However, "[i]f there is evidence of tailoring, beyond the fact that the defendant was simply present at the trial and heard the testimony of other witnesses, a prosecutor may comment, but in a limited fashion." Id. at

35

98-99.  However, in every case, "[t]he prosecutor's comments must be based on the evidence in the record and the reasonable inferences drawn therefrom."  Id. at 99.

Here, we are satisfied defendant's comments fell within permissible bounds.  The prosecutor's reference to the disparity between defendant's statement to detectives, in which he denied shooting Bostic, and his defense at trial as argued by defense counsel in openings[7] and summation, acknowledging that defendant shot Bostic, were clearly supported by the record.  These comments are not equivalent to "the insinuations of manufactured testimony based upon collusion" that were condemned in Nelson, 173 N.J. at 462, and State v. Rose, 112 N.J. 454, 518 (1988), or the statements implying that the defense expert's testimony "was manufactured out of empathy" denounced in State v. Jenewicz, 193 N.J. 440, 472 (2008).  See id. at 471 ("[W]hen the prosecutor stated that [the defense expert] 'crossed over the bridge from being an objective psychiatrist to a subjective advocate' out of a 'zeal to help [the defendant],' it was the prosecutor who crossed the line of acceptability."); Nelson, 173 N.J. at

---

[7]  In her opening statement, defense counsel asserted "Ladies and gentlemen, this is not an identification case.  [Defendant] does not deny that he was there on July 15[], 2015.  He does not deny that he shot . . . Bostic.  He doesn't deny it and he's never denied it."

462 (finding that the prosecutor's allegations that the expert testimony was contrived and that there was collusion between the experts and the defense were not supported by the record and constituted reversible error); Rose, 112 N.J. at 518 (finding misconduct where the prosecutor had stated that defense doctors "were explained the law by the lawyers, as to what he's being charged with, what he faced and how he could beat the penalty that the law provides for him").

We also reject defendant's contention that the prosecutor "unfairly mischaracterized the defense summation" by claiming that "the jury should not convict [defendant] of murder because the person he killed was a drug dealer." On the contrary, the prosecutor "agree[d] completely" with defense counsel that "the fact that [Bostic and defendant were] drug dealers doesn't matter." The prosecutor stressed "we don't judge them to be bad people because of that for this particular case. All it tells us is motive."

On the other hand, we agree with defendant's assertion that the prosecutor denigrated the defense by referring to it as "ridiculous," "an 'insult to [the jury's] intelligence,'" "a 'smokescreen,'" and "a 'trap.'" In urging the jury to reject the passion/provocation defense, the prosecutor exhorted the jury, "Don't fall into the trap. Don't fall into the smokescreen. Don't get lost in the smokescreen. Focus on the facts." As the prosecutor painstakingly reviewed the video

surveillance, he argued that defendant committed premeditated murder, and explained to the jury

> This was no, oh my God, I lost all self-control. It's ridiculous. It's an insult to your intelligence as human beings to think that that is an adequate provocation to lose self-control . . . .
>
> . . . .
>
> There he is, calmly walking. I would describe it like a stroll. And I don't think that's any exaggeration or mere argument. Let's look at it again. Just strolling to go get his 9 millimeter and shoot the [victim eleven] times.
>
> Provoked? Losing self-control, at a loss of self-control there? It's, again, an insult to our intelligence.

Before the prosecutor proceeded any further, the judge sua sponte instructed the jury:

> I'll just ask you to disregard the last remark, jurors. . . . As far as insult to your intelligence. I know it was mentioned twice, but, look, each attorney makes their own arguments . . . . And then, obviously, as I told you, you are the judges of the facts and I will instruct you on the law.

In State v. Acker, we held that the prosecutor's comments in summation "were so egregious, inflammatory and prejudicial as to deny [the] defendant a fair trial," and reversed the defendant's convictions for sexual assault of two minors and related charges. 265 N.J. Super. 351, 356 (App. Div. 1993). There,

38

the prosecutor disparaged the defense with baseless allegations, and, over defense counsel's objection, suggested that it was the jury's "function . . . to protect young victims of alleged sexual offenses as a group." Ibid. While the latter "argument alone had the clear capacity to deprive defendant of his constitutional right to a fair trial," we determined it was also "highly improper for the prosecutor to characterize the defense attorney and the defense as outrageous, remarkable, absolutely preposterous and absolutely outrageous." Id. at 356-57. We noted "defense counsel was attacked unjustifiably for simply trying to discredit the State's case." Id. at 356.

In State v. Ates, we affirmed the defendant's murder conviction, concluding that the prosecutor's comment in summation that his medical expert's testimony "was 'absolutely preposterous,' although improper, was insufficient to raise a reasonable doubt that it led the jury to a verdict it would not have otherwise reached." 426 N.J. Super. 521, 536 (App. Div. 2012). Noting that "the failure to object [gave] rise to an inference that the defense did not view the remark as prejudicial," we explained that "[e]ven when an improper comment is made, . . . we must consider its context to determine whether the prejudicial effect warrants reversal." Ibid. Likewise, here, in light of the considerable evidence of guilt and the judge's sua sponte curative instruction, which was

reinforced in the final charge, we conclude the comments, although improper, were insufficient to raise a reasonable doubt that it led the jury to a verdict it would not have otherwise reached. Indeed, like <u>Ates</u>, "[t]he prosecutor's summation relied on the voluminous evidence introduced by the State implicating defendant in the murder." <u>Ibid.</u>

### C. Comments Implicating Defendant's Election Not To Testify

Next, we consider defendant's contention that the following comment, to which there was no objection by defense counsel, constituted an impermissible reference to defendant's decision not to testify:

> Well, what's clear is that [defense counsel's] arguments have many, many problems. Number one, it's completely at odds with her own client's statement. The [j]udge took quite a bit of time with all of you, during voir dire, to go over that constitutional right, that a defendant does not have any obligation to testify. And that's absolutely true. That's why we took such time and we were so careful about that because there is no constitutional obligation to testify. The burden is on me to prove this offense to you, this murder to you. But many of you voiced that you did expect the defendant to say the truth. And in this case, the defendant chose to speak. He chose to give a sworn statement. You heard the statement. No one was pressuring him. He was calm. He was relaxed. Again, going to the lack of passion/provocation. He didn't sound upset about what happened. He was cool, calm, and collected. He was gonna deny it all. He hadn't seen the [surveillance] video yet. So that was gonna be his first line of defense.

He was just gonna deny it. It wasn't me, I don't know what you're talking about.

So, yeah, that's BS. We can disregard that. It's a BS story, other than that it tells us that he's a liar. He's not gonna say the truth. But the funny thing about the truth, as we all know from life, is that it has a funny way of kind of rising to the surface. We do our best to lie sometimes. We know people in life that just do their best to cover things up, but the truth has a funny way. And for . . . defendant, it managed to rear its ugly head. That statement is littered with the resentment that he had toward [Bostic]. How much motive he had to get rid of [Bostic]. It's not the fight. He tells you in his statement, they fought all the time.

"The Fifth Amendment forbids a prosecutor from commenting upon a defendant's failure to testify as such comment would penalize defendant's constitutional right against self-incrimination." State v. Scherzer, 301 N.J. Super. 363, 439 (App. Div. 1997). Thus, "[r]eversal is mandatory if the prosecuting attorney has unambiguously called attention to [the] defendant's failure to testify in exercise of his fifth-amendment constitutional right." State v. Williams, 113 N.J. 393, 454 (1988); see also Scherzer, 301 N.J. Super. at 439 (finding that a "[c]omment about a defendant's failure to present evidence is impermissible, if it could only be referring to the absence of testimony by the defendant"). However, "[n]ot all prosecutorial comments on [a] defendant's failure to testify . . . compel this result." Williams, 113 N.J. at 454.

Significantly,

> [a] prosecutor has the right to make fair comment on the evidence and to argue to the jury the significance of the testimony presented, but when he begins to discuss the significance of what testimony was not presented and if it does not clearly appear that persons other than defendant could have been called, there is a danger that he may reflect upon a defendant's [f]ifth [a]mendment right to remain silent. Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated.
>
> [Scherzer, 301 N.J. Super. at 440 (quoting State v. Sinclair, 49 N.J. 525, 548-49 (1967)).]

In Sinclair, the Court disapproved of the prosecutor's "repeated remark" that the testimony of an eyewitness "was 'uncontradicted' -- in view of the testimony showing that only Sinclair and his co-defendant could deny the testimony of [the eyewitness]." 49 N.J. at 459. The Court concluded there was a "danger that the jury would draw an improper inference from Sinclair's failure to take the stand." Ibid. In State v. Irizarry, we found reversible error where, over defense counsel's objection, part of the prosecutor's summation "unfairly urged the jury to disregard a proper defense argument because defendant did not testify to support it." 270 N.J. Super. 669, 675 (App. Div. 1994). We reasoned that the prosecutor's comments "lent added weight to the State's evidence in a

42

case where the elements of the crime [were] not clear-cut and the State's proofs left room for a reasonable doubt as to [the] defendant's guilt." Id. at 676.

However, in Williams, the Court found that "[t]he record . . . [was] devoid of any indication that the State improperly referred to [the] defendant's silence at trial." 113 N.J. at 455. The Court explained that "the State's comments were directed to properly admitted evidence, not defendant's failure to testify." Ibid. Likewise, in State v. Purnell, the Court found no reversible error in the prosecutor's references "to the various statements of defendant and his family" or to the prosecutor's comment that the defendant "fail[ed] to explain how his sweatshirt was found at [a prosecution witness's] house." 126 N.J. 518, 539-40 (1992). The Court explained that the sweatshirt comment was in response to defense counsel's assertion in summation that the witness had lied when she testified that the defendant was at her house, and "there [was] no indication that the prosecutor sought to take advantage of defendant's failure to testify in th[e] case." Id. at 540.

Similarly, in State v. Zola, the Court found no misconduct where a prosecutor stated in his opening "[s]cience fails to be of assistance here, and only [the defendant] and [the murder victim] know for sure." 112 N.J. 384, 427 (1988). The Court also found no impermissible comment on the defendant's

failure to testify in "the prosecutor's closing remarks that 'the primary basis for knowing what [the defendant] did or didn't do at [the murder victim's] apartment . . . [was] the self-serving statements of [the defendant] . . . ." Ibid. According to the Court, "these comments were intended to address not so much the failure of the defendant to testify as the incompleteness of the experts' analyses of all the evidence in the trial." Ibid.

Here, because the prosecutor's comments were directed at defendant's statement to the detectives, which was properly admitted at trial, and responded to defense counsel's summation, the comments did not infringe on defendant's constitutional right not to testify. See State v. O'Neill, 193 N.J. 148, 180 (2007) ("In considering the admissibility of a defendant's incriminating statements following unwarned and warned interrogations, the proper standard under state law focuses on whether the defendant knowingly, voluntarily, and intelligently waived his rights before speaking to the police.").

Indeed, given the prosecutor's prefatory comments as well as the judge's instruction in the final charge to "not consider for any purpose or in any manner . . . that defendant did not testify," unlike Sinclair, there was no danger that the jury would draw an improper inference from defendant's failure to take the stand. Further, unlike Irizarry, evidence of defendant's guilt for murder was

overwhelming given the two eyewitness accounts as well as the surveillance videos depicting the shooting. In sum, "[w]e have carefully reviewed each instance of impropriety asserted by defendant[]" and are satisfied that, "[w]hile in several instances the prosecutor walked on or even crossed the line," when viewed both separately and in the aggregate, the prosecutor's comments "did not jeopardize defendant's right to a fair trial." Scherzer, 301 N.J. Super. at 446.

V.

In Point IV of his counseled brief, defendant argues evidence that defendant was a drug dealer "should have been excluded because it was irrelevant, and its probative value was outweighed by its prejudicial effect." Defendant asserts that at the pre-trial hearing to determine the admissibility of the evidence to prove motive, "the [S]tate failed to show that [defendant] and Bostic were competitors, or, for that matter, that either of them w[as] engaged in the drug trade at the time of the shooting."

Our "review of a trial judge's determination on the admissibility of 'other bad conduct' evidence is one of great deference." State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010) (quoting State v. Foglia, 415 N.J. Super. 106, 122 (App. Div. 2010)). Because the decision "rests in the sound discretion of the trial court," State v. Willis, 225 N.J. 85, 96 (2016), "[o]nly where there is a

'clear error of judgment' should the 'trial court's conclusion with respect to that balancing test' be disturbed." State v. Marrero, 148 N.J. 469, 483 (1997) (quoting State v. DiFrisco, 137 N.J. 434, 496-97 (1994)).

"N.J.R.E. 404(b) generally precludes the admission of evidence pertaining to other crimes or wrongs, except to show 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue of dispute.'" Goodman, 415 N.J. Super. at 229 (quoting N.J.R.E. 404(b)). "[W]hen motive or intent is at issue, we generally admit a wider range of evidence." State v. Jenkins, 178 N.J. 347, 365 (2004). In State v. Cofield, 127 N.J. 328, 338 (1992), "the Court articulated a four-part test designed to guide the determination of when to admit such evidence." State v. Barden, 195 N.J. 375, 389 (2008).

The Cofield test requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[State v. Williams, 190 N.J. 114, 122 (2007) (citing Cofield, 127 N.J. at 338).]

"In Williams, however, the Court observed that the second Cofield factor 'is not one that can be found in the language of Evidence Rule 404(b). Cofield's second factor, therefore, need not receive universal application in Rule 404(b) disputes.'" Goodman, 415 N.J. Super. at 230 (quoting Williams, 190 N.J. at 131). Indeed, "[i]ts usefulness as a requirement is limited to cases that replicate the circumstances in Cofield." Williams, 190 N.J. at 131.

> Ultimately, if the party seeking to admit the evidence "demonstrate[s] the necessity of the other-crime evidence to prove a genuine fact in issue and the court has carefully balanced the probative value of the evidence against the possible undue prejudice it may create, the court must instruct the jury on the limited use of the evidence."
>
> [State v. Willis, 225 N.J. 85, 100 (2016) (alteration in original) (quoting Cofield, 127 N.J. at 340-41).]

"The instruction should be given when the evidence is presented and in the final charge to the jury." Barden, 195 N.J. at 390.

Here, following the pre-trial hearing, during which Wilson and Mohammed testified consistent with their trial testimony, the judge admitted, under N.J.R.E. 404(b), the testimonial evidence of drug dealing activities as well as defendant's unredacted admissions in that regard contained in his statement

to detectives. Applying the <u>Cofield</u> factors, the judge determined "the State met its burden by providing . . . clear and convincing evidence" of "drug dealing" to prove "[d]efendant's motive for [the] shooting," which was "highly relevant to the case." The judge expounded that "[e]ach witness testified that [d]efendant and decedent were engaged in drug dealing in the same vicinity," and defendant conceded in his statement that "the decedent thought he was entitled to the lion's share of the activity."

Further, the judge concluded "the probative value of the evidence [was] not outweighed by its prejudice," noting "the fact that the . . . evidence implicates the decedent, in addition to . . . [d]efendant, as a drug dealer tends to lessen the prejudicial effect of the State's evidence." Additionally, the judge gave the requisite limiting instruction when the evidence was presented and in the final charge to the jury. <u>See</u> <u>Feaster</u>, 156 N.J. at 64-65 (noting that it is "presume[d] that the jury adhered to the [trial] court's instruction"). Notwithstanding defendant's contentions to the contrary, we agree with the judge's decision and discern no abuse of discretion. <u>See</u> <u>State v. Green</u>, 274 N.J. Super. 15, 31-32 (App. Div. 1994) (finding that the defendant's "participation in drug sales constituted critical evidence in establishing his motive" for

committing murder based on "the State's theory" that the defendant retaliated against the victim for his earlier robbery of one of the defendant's confederates).

## VI.

In Point V of his counseled brief, defendant argues even if we find no individual errors warranting reversal, the "cumulative effect" of the individual errors "cast[s] sufficient doubt upon the verdict to warrant reversal." Reddish, 181 N.J. at 615; see also Jenewicz, 193 N.J. at 473 ("We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal."). However, we conclude there were no reversible errors and any existing errors lack a cumulative effect to require reversal.

## VII.

In Point VI of his counseled brief, defendant argues the judge "erred in finding that [defendant] was subject to a mandatory extended term, failed to consider a significant mitigating factor, and imposed an excessive sentence."

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). We will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating

factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Defendant argues the judge erred in sentencing him on the murder conviction "to a mandatory extended term pursuant to N.J.S.A. 2C:44-3(d), which applies to a second offender with a firearm, because the evidence does not establish that [defendant] had a prior firearm conviction." Pursuant to N.J.S.A. 2C:44-3, "[i]f the grounds specified in subsection d. are found," and the defendant is being sentenced for committing murder with a gun, among other designated offenses, "the court shall sentence the defendant to an extended term . . . , and application by the prosecutor shall not be required." Subsection d specifies that in order to be eligible for mandatory extended term sentencing, the defendant must be "at least [eighteen] years of age and . . . been previously convicted of . . . [N.J.S.A.] 2C:11-4," among other crimes, and "used or possessed a firearm, as defined in 2C:39-1f., in the course of committing or attempting to commit [that] crime[], including the immediate flight therefrom." N.J.S.A. 2C:44-3(d).

At sentencing, defendant, then thirty-four years old, conceded that he was "eligible for mandatory extended term sentencing," based on a prior homicide. The record reveals that in 2005, defendant pled guilty to reckless manslaughter, N.J.S.A. 2C:11-4, in connection with a robbery. The original indictment charged defendant with murder and related offenses. Accordingly, as correctly noted by the judge, defendant's sentencing exposure on the instant murder charge was "between [thirty-five] years and life imprisonment, of which . . . defendant shall serve [thirty-five] years before being eligible for parole." N.J.S.A. 2C:43-7(a)(6).

Next, defendant argues the judge "erred in failing to consider mitigating factor [eleven,] N.J.S.A. 2C:44-1(b)(11)," based on the hardship his incarceration would cause to his five-year-old son. The judge acknowledged that defendant was "single," "ha[d] no history of employment," and "ha[d] one child, age [five], who currently reside[d] with the mother." While the judge found that "no statutory mitigating factors" applied, or "were cited by the defense," the judge considered defendant's showing of remorse to the victim's family as a non-statutory mitigating factor. On the other hand, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that . . . defendant will commit another offense"); six, N.J.S.A. 2C:44-1(a)(6) ("[t]he extent of . . .

51

defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"); and nine, N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring . . . defendant and others from violating the law").

In that regard, the judge explained:

> [D]efendant has an unabated adult criminal history, which seems only to be interrupted by periods of detention or incarceration.[8]  Despite being just [thirty-four] years of age, defendant has now been convicted of five felonies as an adult, including two separate homicides.
>
> . . . .
>
> There is a substantial need to protect the public from this defendant given his numerous violent convictions, including this most recent offense where he shot and killed a friend of his at point blank range, with multiple shots, even while his friend remained defenseless on the ground.  And, again, this was just two years after being released from State Prison for a manslaughter conviction.

"Based on the analysis of aggravating and mitigating factors," the judge was "clearly convinced that [the] aggravating factors substantially predominate[d]."  Applying our deferential standard of review, we are satisfied

---

[8]   The judge also recounted defendant's juvenile history, consisting of "[nineteen] petitions . . . resulting in ten adjudications[,]" the "first contact" occurring "just one month past [defendant's eleventh] birthday."

that the judge's findings are amply supported by the record, that the sentence comports with the guidelines enunciated in the Code of Criminal Justice, and that the aggregate sentence[9] does not reflect an abuse of discretion or shock our judicial conscience.

## VIII.

In Point I of his pro se brief, defendant argues the judge erred in failing to charge "the lesser included offenses of [a]ggravated [m]anslaughter and [r]eckless [m]anslaughter."  As defendant points out, neither charge was requested by defense counsel at trial.

When a defendant does not request the judge to charge a particular lesser-included offense, the judge need not sua sponte give that instruction unless the facts clearly indicate that the jury could find the defendant guilty of the lesser-included offense, rather than the charged offense.  State v. Choice, 98 N.J. 295, 299 (1985).  Notably, the trial court is not obliged to, "on its own meticulously . . . sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge."  Ibid.

---

[9]  The judge imposed a concurrent ten-year term, with a five-year period of parole ineligibility, on the unlawful possession of a handgun charge, and merged the possession of a weapon for an unlawful purpose charge with the murder conviction.

"Instead, the evidence supporting a lesser-included charge must 'jump[] off the page' to trigger a trial court's duty to sua sponte instruct a jury on that charge." State v. Fowler, 239 N.J. 171, 188 (2019) (alteration in original) (quoting State v. Denofa, 187 N.J. 24, 42 (2006)).

> A defendant commits manslaughter when he acts recklessly, causing the death of another human being. N.J.S.A. 2C:11-4(b)(1). A killing will be considered to constitute aggravated manslaughter if it is done recklessly and "under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a)(1). A defendant acts recklessly when he or she "consciously disregards a substantial and unjustifiable risk" that death will occur from the defendant's conduct, and disregarding the risk "involves a gross deviation from the standard of conduct that a reasonable person would observe" in the same situation. N.J.S.A. 2C:2-2(b)(3).
>
> [Id. at 188-89.]

In Fowler, the Court found no error in the exclusion of aggravated manslaughter or reckless manslaughter as lesser-included offenses of murder where "the jury was presented with two distinct, mutually exclusive versions of events" in the murder trial of defendants Joey Fowler and Jamil Hearns. Id. at 189. "The State depicted a premeditated and purposeful murder" while "[the d]efendants' version asserted that, faced with an armed assailant at close range, Hearns attempted to disarm his attacker using non-lethal force in an unpopulated

area."  Ibid.  The Court concluded that "neither the State's nor defendants' scenario reasonably depict[ed] Hearns as an actor who consciously disregarded a substantial and unjustifiable risk providing a platform for a manslaughter or aggravated manslaughter charge based on recklessness."  Id. at 189-90.

We reach the same conclusion here.  Neither the State's nor defendant's scenario provided the basis for an aggravated manslaughter or reckless manslaughter charge, "let alone constitutes a scenario where that conclusion jumps off the page."  Id. at 190.

IX.

In Point II of his pro se brief, defendant argues the State deprived him of a fair trial by failing to disclose correspondence received from a behavioral healthcare facility until one day before the jury returned its verdict.  The correspondence related that Wilson was suffering from "suicidal ideation" when she was admitted into their program in May 2017, some four months before the trial.  According to defendant, the evidence was both exculpatory and newly discovered evidence.

"It is well-settled that the suppression by the prosecution of evidence favorable to a defendant violates due process of law where the evidence is favorable to the defense, and is material."  State v. Russo, 333 N.J. Super. 119,

133-34 (App. Div. 2000) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).

The result is referred to as a Brady violation. "In order to establish a Brady

violation, the defendant must show that: (1) the prosecution suppressed

evidence; (2) the evidence is favorable to the defense; and (3) the evidence is

material." State v. Martini, 160 N.J. 248, 268-69 (1999) (alterations in original)

(quoting Brady, 373 U.S. at 87). "[E]vidence is 'material' if there is a 'reasonable

probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different.'" Id. at 269 (quoting United States v.

Bagley, 473 U.S. 667, 682 (1985)).

On the other hand,

> to qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.
>
> [State v. Carter, 85 N.J. 300, 314 (1981).]

"[D]etermining whether evidence is 'merely cumulative, or impeaching,

or contradictory,'" under prong one of the Carter test "necessarily implicates

prong three[.]" State v. Nash, 212 N.J. 518, 549 (2013) (quoting State v. Ways,

180 N.J. 171, 188-89 (2004)). Because "prongs one and three are inextricably

56

intertwined," evidence that "'would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict' could not be categorized as 'merely cumulative.'" Ibid. (quoting Ways, 180 N.J. at 189). All three prongs "must be met before the evidence can be said to justify a new trial." Carter, 85 N.J. at 314.

Here, defendant failed to establish that the evidence constitutes either exculpatory or newly discovered evidence to meet either standard. Significantly, even assuming delayed disclosure and the potential to impeach Wilson's credibility, given the overwhelming evidence of defendant's guilt, we are satisfied that the result of the proceeding would have been no different.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4010-17T4